711 A.2d 382

KATHLEEN BROUGH AND DAVID ISRALOWITZ, PLAINTIFFS–
APPELLANTS, v. HIDDEN VALLEY, INC., HIDDEN VALLEY
SKI AND TENNIS CLUB, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued May 19, 1998—Decided June 5, 1998.

140

Before Judges PRESSLER, CONLEY and CARCHMAN.

*Terry Paul Bottinelli* argued the cause for appellants (*Herten, Burstein, Sheridan, Cevasco, Bottinelli & Litt,* attorneys; *Mr. Bottinelli,* of counsel; *Mr. Bottinelli* and *Thomas S. McGuire,* on the brief).

*Bradley M. Wilson* argued the cause for respondents (*Sachs, Maitlin, Fleming, Greene & Wilson,* attorneys; *Mr. Wilson,* on the brief).

The opinion of the court was delivered by

CONLEY, J.A.D.

Plaintiff sustained serious injuries while skiing with her daughter on one of defendants' ski slopes when she fell into an uncovered concrete box a short distance off the trail. Plaintiff and her husband sued defendants alleging various theories of negligence. Following two unsuccessful motions for summary judgment brought by defendants based upon a release signed by plaintiffs, the matter was tried before a jury over seven days. The jury no caused on the issue of negligence. On appeal plaintiffs contend:

POINT I. THE TRIAL COURT ERRED IN ALLOWING DEFENSE COUNSEL TO QUESTION PLAINTIFF CONCERNING AN ALLEGED EXCULPATORY CLAUSE.

POINT II. THE TRIAL COURT ERRONEOUSLY PRECLUDED PLAIN-
TIFF FROM QUESTIONING DEFENSE WITNESSES FOR PURPOSES OF
IMPEACHMENT RESPECTING SUBSEQUENT CHANGES TO THE AC-
CIDENT SCENE.

POINT III. A NEW JURY PANEL SHOULD HAVE BEEN SUMMONED
AFTER ONE PROSPECTIVE JUROR EXPRESSED BIAS IN OPEN
COURT.

POINT IV. THE TRIAL COURT ERRED IN FAILING TO INSTRUCT THE
JURY AS TO FEASIBLE ALTERNATIVES TO THE DESIGN, LOCATION
AND/OR LACK OF SAFETY FEATURES OF THE BOX WHICH PLAIN-
TIFF FELL INTO.

POINT V. THE JURY VERDICT IS AGAINST THE WEIGHT OF THE
EVIDENCE.

██ We have carefully considered these contentions. We con-
clude that error in the judge's jury charge on the New Jersey Ski
Statute (Ski Statute), *N.J.S.A.* 5:13–1 to –11 (point IV), and error
in defense counsel's use of the release provisions (point I) require
a new trial. Although we need not address the remaining points,
we comment as to point II that plaintiffs should have been
permitted to use photographs showing warning poles by the
concrete box, taken eleven days after the accident, to cross-
examine defendants' witness who had asserted that no warnings
were ever posted. *Snyder v. American Assoc. of Blood Banks,*
282 *N.J.Super.* 23, 46, 659 *A.*2d 482 (App.Div.1995), *aff'd,* 144 *N.J.*
269, 676 *A.*2d 1036 (1996). If on retrial the plaintiff uses the
photos for such impeachment purposes, a limiting instruction
should be given. *E.g., Lavin v. Fauci,* 170 *N.J.Super.* 403, 408,
406 *A.*2d 978 (App.Div.1979).

## I.

In 1990 plaintiffs, Kathleen Brough and her husband David
Isralowitz, purchased a condominium in Hidden Valley and joined
the Hidden Valley Ski Club. On February 17, 1992, Kathleen and
her daughter Beth were skiing the "Browse Along Trail" owned
and operated by defendants. The trail starts with a beginner
section, turns into an intermediate section for approximately fifty
feet and then ends as a beginner section. Kathleen had previously
skied that trail approximately two hundred times. On that partic-

ular day, she was skiing ahead of Beth in the last section of the trail when she "hockey stopped"[1] on the right hand side of the trail and turned toward the hill to watch her daughter. Suddenly she fell backwards. She did not know what caused her to fall. She fell downward and ended up in a concrete box, also referred to as a catch basin or junction box.

Beth testified at trial that she saw her mother hockey stop approximately twenty feet in front of her, wave and then start to lose her balance and slip backwards. Although Beth did not actually see her mother's backward descent, she did see her "disappear."

The concrete box, apparently used to connect two drainage culverts, measured four feet nine inches by four feet. It was estimated as sixteen to twenty-four inches deep. Although the box was obviously designed with a cover, it was uncovered at the time of the accident. An hour after the accident, the cover was put back on. The area where plaintiff fell contained no warnings of a dangerous drop or as to the location of the concrete box.

Plaintiff did not remember seeing the box on her prior trips down the trail and testified that the box was adjacent, i.e., "touching" the trail. Irv Kinney, a Ski Patroller at Hidden Valley and the first to respond to the scene, estimated that the distance from the top of the concrete box's wall to the trail was approximately eight feet. He testified that the concrete box was "at the edge of the treeline" approximately eleven feet removed from the snow.

Plaintiffs' expert and accident reconstructionist, Dick Penniman, inspected the site of the accident on August 25, 1992. It was his opinion that the location of the concrete box was not necessary and that concrete and steel were inappropriate construction materials for a structure in the proximity of a ski trail. In his view, the

---

[1] A hockey stop is a method of stopping whereby the skier lifts his or her skis and digs the edges into the snow.

box could have been located either further up or down the hill to reduce potential contact with skiers. In this respect, he testified:

> I've never seen anything like it before and I wouldn't expect a skier—first of all, to have been exposed to something like this on a regular basis before and secondly, because of the configuration of the trail they won't see it as they're skiing down, if they're skiing in the middle of the trail or even close to the edge they can't see over that breakover. They're not even going to be aware it's there, all they're going to know there are some trees and stuff on the sides of the trails, they're not going to be aware of anything like this.

Although he conceded that he was not aware of any written codes or standards that require the box to be buried, he also said that "there is a custom and practice that would say that any obstacle of this kind on or near a trail should be padded, fenced or otherwise eliminated." Warnings as well would have reduced the risk of harm. A cover on the box, at the least, he thought would have avoided the injury. It was, finally, his opinion that the dangerous condition created by the box was not an inherent risk in recreational skiing.

Defendants took the position that the location of the box was not a hazard, was necessary and was off the ski trail. In this respect, Robert Benyon, Director of Operations for Hidden Valley, explained that it was not marked as a hazard "[b]ecause it's not ... anywhere near the skiing surface and we would not consider it a hazard." He felt that the location of the box was necessary. Similarly, Hidden Valley's Ski Patrol Director, Michael Hahn, had never considered the box a hazard because "[i]t's too far into the woods ... it's ... right by the tree line and the trail's nowhere near it." The same view was expressed by Gary Brooks, a Ski Patroller at Hidden Valley. However, he concluded on cross-examination that since Hidden Valley made artificial snow, the location of the trail could be changed depending on how the snow was placed. Defendants' witnesses, moreover, disagreed that a cover on the box would have prevented the injuries. Indeed, Benyon testified that had the box been covered at the time plaintiff fell into it, she would have sustained more serious injuries "because the terrain on the other side of the box is much rougher than in the box itself."

Finally, defendants' expert, John Perryman, secretary of the American Society for Testing and Materials (A.S.T.M.) Committee on skiing safety, testified that there were no written or adopted standards for the use of protective devices in ski areas. He opined that there was no need for warnings, padding or protective fencing in this instance as the concrete box was "off the trail" and "not a hazard." Moreover, he too believed that padding, a covering or warnings would not have prevented plaintiff's injuries.

## II.

The claim of negligence on the part of defendants, of course, must be considered within the context of the Ski Statute and the charge to the jury must be consistent therewith. The trial judge must relate the law to the facts of the case and " 'a charge which misleads a jury will require a reversal and a new trial.' " *Myrlak v. Port Auth. of N.Y. and N.J.*, 302 *N.J.Super.* 1, 19, 694 *A.*2d 575 (App.Div.), *certif. granted,* 152 *N.J.* 10, 702 *A.*2d 349 (1997) (quoting *Vallejo by Morales v. Rahway Police Dep't,* 292 *N.J.Super.* 333, 342, 678 *A.*2d 1135 (App.Div.), *certif. denied,* 147 *N.J.* 262, 686 *A.*2d 763 (1996)). "A proper jury charge should 'outline the function of the jury, set forth the issues, correctly state the applicable law in understandable language, and plainly spell out how the jury should apply the legal principles to the facts as it may find them....' " *Facendo v. S.M.S. Concast, Inc.*, 286 *N.J.Super.* 575, 588, 670 *A.*2d 44 (App.Div.1996) (quoting *Navarro v. George Koch & Sons, Inc.*, 211 *N.J.Super.* 558, 570, 512 *A.*2d 507 (App.Div.), *certif. denied,* 107 *N.J.* 48, 526 *A.*2d 138 (1986)).

The defendants' theory on the issue of negligence, both through its witnesses and as argued in summations was that the plaintiff assumed the risk of injury in skiing and that because the manmade concrete box was located off the trail, defendants owed no duty to eliminate or lessen the dangers posed by it. Plaintiff's expert in contrast, asserted that the concrete box posed a danger caused by its proximity to the trail and that defendants had a duty to remove or reduce that danger. In other words, the concrete

box was not an inherent risk of the sport that a skier must assume but rather was a hazard that defendants had a duty to remove or reduce.

In this respect, the Ski Statute requires ski resort operators to post signs or distribute information on the difficulty and condition of ski trails and to "[r]emove as soon as practicable obvious, man-made hazards." *N.J.S.A.* 5:13–3(a)(1) to –3(a)(3). A ski operator's statutory responsibilities, however, do not extend to risks that are "inherent" in the sport. It is the skier who assumes those risks. *N.J.S.A.* 5:13–5. *And see N.J.S.A.* 5:13–3(b)(3). But such a risk is simply "one that cannot be removed through the exercise of due care if the sport is to be enjoyed." *Brett v. Great Am. Recreation, Inc.,* 144 *N.J.* 479, 499, 677 *A.2d* 705 (1996). *Accord Reisman v. Great Am. Recreation, Inc.,* 266 *N.J.Super.* 87, 94–95, 628 *A.2d* 801 (App.Div.), *certif. denied,* 134 *N.J.* 560, 636 *A.2d* 519 (1993) (a drunken and dangerous skier is clearly not an inherent risk of the sport of skiing). *See also Pietruska v. Craigmeur Ski Area,* 259 *N.J.Super.* 532, 537, 614 *A.2d* 639 (Law Div.1992) ("[i]mproper operation of a ski lift is not an inherent risk of skiing since, with due care, it can be eliminated.").

As construed in *Brett,* the operator's duty under the Ski Statute to "remove 'obvious, man-made hazards' " is "couched in general terms," *Brett, supra,* 144 *N.J.* at 499, 677 *A.2d* 705, and "casts a wide net." *Id.* at 500, 677 *A.2d* 705. Excluded are "hazards that occur naturally on the mountain, . . ." but "[by] its nature an alpine ski area is not a purely unaltered wilderness." *Ibid.* Thus, included in the operators' statutory duty of care are man-made dangers that may feasibly be removed, eliminated or reduced. *Id.* at 500–01, 677 *A.2d* 705. That this is clear is evident from the court's rejection of the more narrow view adopted by some other courts. "[T]he better view is that design issues should be subjected to the same analysis as other risks. Thus, where a hazard resulting from a design flaw may be removed or eliminated, it is not inherent and, if obvious, the operator has the duty to remove it." *Id.* at 501, 677 *A.2d* 705. *See White v. Deseelhorst,*

879 *P.*2d 1371, 1375 (Utah 1994) (holding that a jury could find that the placement of a "cat track" intended to smooth a traverse for novice skiers was unnecessarily dangerous and not an inherent risk).

As illustrative, the court in *Brett* characterized the placement of ski-lift towers, the use of artificial snow and the layout of trails as "man-made contributions to the skiing environment." *Id.* at 500, 677 *A.*2d 705. Thus, "a jury could reasonably find that a tree left standing in the middle of a blind corner on a steep trail was an 'obvious, man-made hazard' ", *ibid.*, and "[a] jury might properly find that a ski-lift tower placed where skiers might be expected to crash into it is a non-inherent, man-made risk if it could have been placed in a safer location." *Id.* at 501, 677 *A.*2d 705. Similarly, as to the specific alleged man-made hazard in *Brett* (design of a ski slope on one side of a snow fence with an embankment, parking lot and telephone pole, into which plaintiff's toboggan had crashed, on the other side), the court observed "the jury could have considered whether it was appropriate to locate the parking lot and the utility pole so close to the bottom of the hill or whether they could have been relocated and the flat area at the bottom of the hill extended ... [and that] [m]ore efficient security patrols, or ... a sign warning that tobogganing was unsafe [on the slope], might have reduced the hazard and thus 'removed' it for the purposes of the Ski Statute." *Id.* at 507, 677 *A.*2d 705.

So too the concrete box here. It was, of course, a man-made object which, although not on the ski slope itself, could have been considered by the jury close enough to create the risk of a skier sliding or falling off the trail into it, thus posing a hazard. Certainly defendants were aware of its existence. If not actually aware of its dangerous potential, the jury could have concluded its dangerousness was "obvious" and thus imputed constructive knowledge. *See Brett, supra,* 144 *N.J.* at 500–01, 506–07, 677 *A.*2d 705. There was, moreover, ample evidence for the jury to have concluded, under the circumstances, that the concrete box should have been made safer by, for instance, relocating it, placing

warnings on the trail of its existence, or simply insuring that its cover was kept on.

For the jury to understand, however, that such considerations of defendants' statutory duty would have been appropriate, requires more in the charge than the mere language of the statute. This is so because the pertinent statutory language, that is removal of an obvious man-made hazard, would not to the ordinary person necessarily convey its permissible scope. In *Brett,* for instance, the trial judge first made clear to the jury that the design of the slope, embankment, the parking lot and its telephone pole, could be considered man-made hazards. Second, he explained, as to the element of obviousness, that ordinary usage should be the guide and that " 'among the definitions of obvious in ordinary usage is something that . . . is easily discovered, easily seen, easily understood, is something that is plain, patent, apparent, evident, clear, or manifest, or something that is readily perceived by the eye or the intellect. . . .' " *Id.* at 492–93, 677 *A.*2d 705. He also instructed that the expert testimony should be considered in determining whether an obvious man-made hazard existed. *Id.* at 492, 677 *A.*2d 705.

Third, and perhaps more critically here, as to the duty to "remove" a man-made hazard, the jury was charged in *Brett:*

You should consider the use of the word "remove" in its ordinary and customary meaning. Now without intending to limit you . . . I can indicate to you that it would be proper for you to consider that remove means not only to physically uproot, take to a different position, it also can mean to eliminate or reduce or obviate.

[*Id.* at 493, 677 *A.*2d 705.]

The charge in *Brett* "correctly directed the discretion of the jury," *id.* at 506, 677 *A.*2d 705, and, thus, defendants' contention that the jury instructions imposed too broad a duty was rejected. *Brett v. Great Am. Recreation,* 279 *N.J.Super.* 306, 317, 652 *A.*2d 774 (App.Div.1995), *aff'd,* 144 *N.J.* 479, 677 *A.*2d 705 (1996).

In contrast, the jury here was charged with no more than the statutory language. This is to say, all that was said as to defendants' duty was:

> You should understand, members of the jury, that is the responsibility of the operator, to the extent practical—and of course that would be Hidden Valley, *to remove* as soon as practical the *obvious man-made hazards.*
>
> [Emphasis added.]

This brief recitation of the statutory language was immediately followed by the following:

> You should understand, members of the jury, that no operator shall be responsible to any skier or other person because of its failure to comply with any provisions—any of the provisions of this subsection if the failure was caused by, members of the jury, the location of man-made facilities and equipment necessary for ordinary operation of a ski area, such as transportation, grooming vehicles, which are marked by flashlights or other suitable sight or sound—sound device towers, fencing of any type, racing poles, or any other object or piece of equipment utilized in connection with the maintenance of the trails, building, or other facilities used in connection with skiing.

■ To begin with, the entire second paragraph of this charge seems to obviate a breach of the operator's statutory duty if caused by "the location of man-made facilities and equipment necessary for ordinary operations of a ski area. . . ." Our previous discussion of *Brett* plainly shows this to be erroneous. The mere location of man-made facilities and equipment necessary for the ordinary operation of a ski slope is not necessarily an inherent risk of the sport assumed by the skier, neither does it absolve the operator of its duty should such location be considered by a jury to be an obvious man-made hazard. *And see N.J.S.A.* 5:13-3(b)(3) (operator not responsible for a failure to comply with its duties under *N.J.S.A.* 5:13-3(a) where the location of man-made facilities and equipment are involved *except* as to its duty under *N.J.S.A.* 5:13-3(a)(3) to "[r]emove . . . obvious, man-made hazards.").

Further, the charge failed to give the jury any guidance as to whether the alleged hazard, the concrete box, was "obvious." Moreover, given defendants' emphasis that the area of plaintiff's fall and the concrete box itself was off the ski trail, the jury should have been told that that factor would not be dispositive if it otherwise concluded an obvious man-made hazard did exist.

■ Finally, and perhaps most critically, although a substantial dispute between the parties was over the feasible alternatives and

safety measures that could have reduced the risk of harm, the charge gave the jury virtually no instructions as to that. Indeed, it essentially removed consideration of much of the dispute by its limitation of the operator's duty to that of "remov[al]" as soon as practical. *Brett* makes clear that the operator's duty extends as well to reducing the danger through safer alternatives, warning devices or other safety measures, including keeping its cover on. *Brett, supra,* 144 *N.J.* at 507, 677 *A.*2d 705. To put it mildly, the jury charge here was woefully inadequate and largely misleading.

## III.

When plaintiffs purchased their condominium at Hidden Valley, they were required to become members of the resort and, amongst the various closing documents, signed a "Member Winter Dues Application." Included in that application is the following release language:

> I understand and accept the fact that alpine skiing in its various forms is a hazardous sport that has many dangers and risks. I realize that injuries are a common and ordinary occurrence of this sport. I agree, as a condition of being allowed to use the ski area facility and premises, that I freely accept and voluntarily assume all risks of personal injury or death or property damage, and release Hidden Valley Ski Area and its agents, employees, directors, officers and shareholders from any and all liability for personal injury or property damage which results in any way from negligence, conditions on or about the premises and facilities, the operations of the ski area including, but not limited to, grooming, snow making, ski lift operations, actions or omissions of employees or agents of the area, or my participation in skiing or other activities at the area, accepting myself the full responsibility for any and all such damage or injury of any kind which may result.[2]

---

[2] In addition, the Hidden Valley brochure detailing lift ticket prices states in bold print: "SKIERS USE THE SKI FACILITIES AT THEIR OWN RISK, ACCEPTING THAT SKIING CAN BE HAZARDOUS AND THAT SKI CONDITIONS CAN CHANGE THROUGHOUT THE DAY OR EVENING." And the lift ticket contains the following liability release clause:

> I understand and accept all terms and conditions posted at the place this ticket was issued and realize I am bound by them as a condition of using the ticket and any facilities of this ski area. I accept that I will be exposed to inherent and other risks and dangers that cause serious injury or death. I, therefore, agree to accept full responsibility for any and all injuries or

During the trial, defense counsel presented a blown up copy of the release, marked as exhibit D–1. Over plaintiffs' counsel's objection,[3] the trial court permitted defense counsel to confront Kathleen with D–1, asking:

QUESTION: And this also says "as a condition to the issuance of a pass at Hidden Valley I agree to assume all responsibility for injury to myself or injury that I may cause to another person while using the facilities at Hidden Valley" correct?
ANSWER: Yes.
QUESTION: And it also has a release from liability?
ANSWER: Yes.
QUESTION: And you signed it?
ANSWER: Yes.

When, during a subsequent "charge conference," plaintiffs' counsel moved to have the release excluded from evidence, the trial judge stated "[a] release of this nature cannot override any statutory duties and, therefore, I rule, as a·matter of law, cannot bar the lawsuit." At the close of the conference, the following exchange took place:

DEFENSE COUNSEL: I can still use the release in my summation, it just doesn't go to the jury.
COURT: It's part of the testimony. It just—
DEFENSE COUNSEL: Well, just the release as a matter of law is immaterial, it's irrelevant, it's confusing and under—
COURT: Well, I don't want you to say that they're barred. You can say that the plaintiff was aware that—... she signed something that indicated she would incur any risks regarding the slope. I mean you can argue it's part of the ... case, but don't say to the jury it's a bar. I mean, because I ruled that out.

---

property damage and agree to make no claim against the ski area or any of its owners or employees for any injury or harm to me regardless of cause. I agree that any use of this ticket or facilities confirms absolutely my agreement to be bound by all these terms and others posted, whether I obtained this ticket myself or it was provided to me by someone else.

[3] We pause to express, once again, our concern over unrecorded sidebars. Plaintiffs' objection to the use of D–1 was heard at such a sidebar. It appears from subsequent comments by the trial judge that one of his rulings at that time, and perhaps at an even earlier unrecorded sidebar, may have been that the release was void as against public policy, for what reason we do not know. Such rulings should have been recorded. *R.* 1:2–2; *State v. Green*, 129 *N.J.Super.* 157, 166, 322 A.2d 495 (App.Div.1974).

Moments later, when the court officer asked if the attorneys could use a blown up copy of the release, the trial judge answered no, stating "[i]t does not go into evidence . . . it does not go into the jury room." Nonetheless, during summations defense counsel was permitted to remind the jury of the blown up release. He said:

> Mrs. Brough testified that she reviewed a document acknowledging that skiing is in fact a dangerous activity. And she said that she agreed to assume all responsibility for injury to herself, for injury that I may cause to another person while using the facilities at Hidden Valley, and that she understands and accepts the fact that outlying skiing in its various forms is a hazardous sport that has many dangers and risks. . . .

What these circumstances reveal is that despite the ruling that the release could not bar plaintiffs' claim of negligence and despite the judge's apparent acknowledgement of its lack of any evidential value, the release, as enlarged on D–1, nonetheless was presented to the jury during cross-examination of plaintiff and through summations of counsel. It was, as far as the jurors were aware, evidential. Indeed, when the jury asked for the closing documents, evidently looking for the release, the judge told them that although the document was not part of the exhibits, they could rely upon their recollections of the evidence.

Plaintiffs contend that intrusion of the release into the case was highly prejudicial and harmful error, requiring a new trial. Specifically, plaintiffs contend that given the obligations imposed on ski operators by the Ski Statute any release discharging liability that would arise under the Statute is "patently invalid" and against public policy. Further, plaintiffs point out the denial of defense counsel's two summary judgment motions seeking to bar the suit because of the release. Thus, according to plaintiffs, "[a]s the trial court had already adjudicated the issues of enforceability of the release in Plaintiffs favor twice before, application of the law of the case doctrine to the subsequent trial of the same suit was wholly appropriate so that the court should have precluded defense counsel from referring to the alleged exculpatory clause during trial." *See Bahrle v. Exxon Corp.*, 279 *N.J.Super.* 5, 21, 652 *A.2d* 178 (App.Div.1995), *aff'd*, 145 *N.J.* 144, 678 *A.2d* 225 (1996) ("[u]nder the law-of-the-case doctrine, 'where there is an

unreversed decision of a question of law or fact made during the course of litigation, such decision settles that question for all subsequent stages of the suit.' " (quoting *Slowinski v. Valley Nat'l Bank,* 264 *N.J.Super.* 172, 179, 624 *A.*2d 85 (App.Div.1993))).

Plaintiffs rely on *McCarthy v. National Assoc. for Stock Car Auto Racing, Inc.,* 87 *N.J.Super.* 442, 450, 209 *A.*2d 668 (Law Div.1965), *aff'd,* 90 *N.J.Super.* 574, 218 *A.*2d 871 (App.Div.1966), *aff'd,* 48 *N.J.* 539, 226 *A.*2d 713 (1967), to argue that defendants could not invoke the release to discharge their statutory responsibilities. In *McCarthy,* plaintiff was a racing car driver who had signed releases which purported to immunize defendants from future liability for his injury or death resulting from his participation in a stock car race promoted by defendants. After sustaining serious burns when his car caught fire during the race, plaintiff claimed that defendants had negligently inspected the car in violation of state safety regulations. Defendants, in response, raised the defense of the releases. The trial court ruled that the releases signed by plaintiff were against public policy and could not bar plaintiff's action. 90 *N.J.Super.* at 576–77, 218 *A.*2d 871. In affirming this decision, the Supreme Court held that "[t]he prescribed safety requirements may not be contracted away, for if they could be the salient protective purposes of the legislation would largely be nullified." 48 *N.J.* at 543, 226 *A.*2d 713. *But see McBride v. Minstar, Inc.,* 283 *N.J.Super.* 471, 487, 662 *A.*2d 592 (Law Div.1994), *aff'd,* 283 *N.J.Super.* 422, 662 *A.*2d 567 (App.Div.), *certif. denied,* 143 *N.J.* 319, 670 *A.*2d 1061 (1995) (*McCarthy* "merely provides an example of an unenforceable exculpatory clause; it by no means suggests a presumptive ban on all such agreements.").

In *McBride,* plaintiff, a New Jersey resident, purchased ski equipment in a Massachusetts ski shop and signed a release of liability in which he agreed not to sue for injuries occurring through the use of the ski equipment. After sustaining injuries while skiing when his bindings broke, plaintiff sued the seller and manufacturer. The trial court concluded that the release was

enforceable. In doing so, the court commented "there is nothing to suggest that the people of ... New Jersey ... would require the courts to approach skiers with special solicitude or render them immune from the effects of their private agreements with the skiing industry." *Id.* at 488, 662 *A.*2d 592. *And see Harmon v. Mt. Hood Meadows, Ltd.,* 146 *Or.App.* 215, 932 *P.*2d 92 (1997) (release provisions in season ski pass application did not violate public policy and barred skier's negligence suit against operator). *But see Yauger v. Skiing Enters., Inc.,* 206 *Wis.*2d 76, 557 *N.W.*2d 60 (1996) (release in application for season ski pass was void as against public policy because it was not conspicuous and did not explicitly waive applicant's right to bring negligence action); *Dalury v. S–K–I, Ltd.,* 164 *Vt.* 329, 670 *A.*2d 795, 799 (1995) (release agreement signed by injured skier was void as contrary to public policy for "[d]efendants, not recreational skiers, have the expertise and opportunity to foresee and control hazards, and to guard against the negligence of their agents and employees.").

We assume the basis for the denial of defendants' motions for summary judgment and the basis for the trial court's rulings as to the admissibility and use of D–1, was the conclusion that an affirmative statutory duty of care imposed upon ski resort operators by *N.J.S.A.* 5:13–3(a) cannot be the subject of what, in effect, are contracts of adhesion. Defendants do not appear to disagree and have not cross-appealed from the summary judgment denial or the trial judge's ruling. Given this posture of the case, we see no basis for taking on what might appear to be an inconsistency between *McCarthy* and *McBride* and further discoursing on the divergent out-of-state views. We comment only that *McBride* did not implicate the Ski Statute. Neither did it involve a release obtained under the type of circumstances here which can only be characterized as adhesive. As we have said, the release was included in a "membership agreement" which was one of several closing documents plaintiffs were required to sign. There was nothing in those documents that would have alerted plaintiffs to the fact they were releasing defendants from their statutory duties.

■ Further, the release here does not expressly focus upon liability that might arise from a failure of defendants to comply with their statutory duty of care; neither do the provisions in the ski lift tickets. The general thrust of these provisions, vis-a-vis skiing activities, seems to be no more than to reinforce the skiers' statutory assumption of the inherent risks of the sport. This assumption, of course, is other than for the risks of obvious man-made hazards created by the ski resort operators. Thus, even if, as sought to be applied here, the release is not against public policy, a dubious conclusion, the release could not act as a bar as it does not pertain to the Ski Statute.

■ In any event, under the particular circumstances here, D–1 should have had no role whatsoever in the trial. We quite agree with plaintiffs that the trial judge erred in permitting any reference to it and in permitting the jury to see the blown up. We reject defendants' suggestion that the error was harmless because the jury found no negligence and therefore must not have considered the release at all. Having not been instructed that the release could not be considered for any aspect of the case, including negligence, we do not understand the proposition that the jury must not have considered the release when deliberating on the issue of negligence. The only request of the jury was for a copy of the "contract closing" documents which contained the release provision enlarged on D–1. And the jury was permitted to continue considering the release, albeit using its collective recollection of the evidence. We think it very likely that the no cause verdict here was the product of the improper intrusion of the release into the trial.

### IV.

Reversed and remanded for a new trial consistent with this opinion.