975 A.2d 992 (2009)
408 N.J. Super. 626
Gloria HUBNER and Michael Hubner, Plaintiffs-Appellants,
v.
SPRING VALLEY EQUESTRIAN CENTER, Defendant-Respondent.
DOCKET NO. A-4723-07T1.
Superior Court of New Jersey, Appellate Division.
Argued March 3, 2009.
Decided August 4, 2009.
*994 Andrew M. Wubbenhorst, Riverdale, argued the cause for appellants (Johnson, Murphy, Hubner, McKeon, Wubbenhorst, Bucco & Appelt, attorneys; Mr. Wubbenhorst, on the brief).
Richard J. Mirra, Edison, argued the cause for respondent (Hanlon Boglioli & Hanlon, attorneys; Mr. Mirra, on the brief).
Before Judges GRAVES, GRALL and ASHRAFI.
The opinion of the court was delivered by
GRALL, J.A.D.
Plaintiffs Gloria and Michael Hubner appeal from a grant of summary judgment in favor of defendant Spring Valley Equestrian Center. The trial court concluded that recovery for Gloria's personal injuries and Michael's consequential loss was barred by statutes allocating the risks and costs of equine animal activities, N.J.S.A. 5:15-1 to -11 (the equine activities liability act), and by Gloria's agreement to release Spring Valley from liability for its ordinary negligence.
The facts, stated in light of the evidence and reasonable inferences most favorable to plaintiffs, are as follows. Gloria, Michael and four others in their party went to Spring Valley Equestrian Center to ride Spring Valley's horses on trails with the guidance of a Spring Valley employee. Upon arrival, Gloria signed a rental agreement and a release discharging Spring Valley of its liability for any injury she might sustain due to the ordinary negligence of Spring Valley or its agents in relation to its "premises and operations."
After signing the agreement and release, the members of the Hubner party were taken to a barn in which Spring Valley's horses were stabled. The barn has an open area in which the Hubner party stood before mounting. About fifteen feet from that area, there were between six and eight poles lying on the barn's floor. The poles were made of pine and about six inches in diameter. They were approximately fourteen to sixteen feet long and were positioned parallel to and several feet from one another. The purpose of the poles was to simulate a horse stepping over obstacles along the trail so as to acquaint the horse and rider with such conditions before encountering them on the trails. The barn was also equipped with a set of movable stairs for the use of riders unable to mount a horse from ground level.
Kate Martin, a trainer and trail guide employed by Spring Valley, led a horse known as "Lady" to Gloria. Lady was already bridled and saddled. Gloria mounted from the ground while Martin stood by. At that point, Lady was facing the poles arranged on the ground, but after Gloria was on the horse Martin led Lady away from the mounting area. Whether Martin turned Lady or Lady turned on her own, Lady and Gloria ended up facing in the opposite direction and away from the poles behind them.
Martin left Gloria and Lady and went to get a horse for another member of the Hubner party. Lady whinnied, moved her head up and down and then moved backward. Martin, who had returned, told Gloria to release the reins, which Gloria did immediately. Nonetheless, Lady continued to back up, tripped on the poles and *995 fell. In the process of falling, Lady threw Gloria onto the movable steps, landed on top of Gloria and rolled over Gloria to stand up. Gloria sustained fractures and other injuries.
Plaintiffs' expert, Andrew J. Elder, attributed the accident to Spring Valley's negligence in equipping and using its barn. Elder explained:
The defendant's use of unsecured jumping poles on the ground of the arena, in close proximity to the mounting of the horses, was negligent, and improper. As succinctly stated by author Donna Snyder-Smith in "The All-Around Horse" ... the poles, called "cavaletti," should be set up correctly:
1. Don't scare your horse by riding him into a long line of poles the very first time you work him over cavaletti.
2. If you use the poles on the ground, be sure they are secured so they will not roll over if your horse steps on them.
This is precisely what the [d]efendant did wrong. These poles were not secured in any way in the traditional "x" base or other manner of securing them from rolling. In addition, they were set up in close proximity to the mounting area, and behind the horses. Horses cannot see behind them and the stepping on the unsecured pole would cause the horse to be further frightened and could cause it to fall as it did in this instance.
The Legislature has determined that "the allocation of the risks and costs of equine animal activities is an important matter of public policy and it is appropriate to state in law those risks that the participant voluntarily assumes for which there can be no recovery." N.J.S.A. 5:15-1.[1] That determination is based on the Legislature's recognition of the "large number of citizens of this State" who participate in such activities, the attraction these activities hold for nonresidents, and the positive impact of such activities on this State's economy and open space. Ibid. The rationale underlying the Legislature's ultimate allocation is that equine activities "involve risks that are essentially impractical or impossible for the operator to eliminate," and which "must be borne by those who engage in the activities." Ibid.[2]
Consistent with those findings and declarations, the Legislature has limited the liability of those who operate such activities by identifying the "inherent risks" that participants assume and by barring suit and providing a complete defense for injuries resulting from the assumed risks. N.J.S.A. 5:15-2 (defining "[i]nherent risk or risks of equine animal activity"); N.J.S.A. 5:15-3 (providing for assumption of inherent risks); N.J.S.A. 5:15-5 (stating the bar and defense);[3]see Stoffels v. Harmony Hill Farm, 389 N.J.Super. 207, 215-17, 912 A.2d 184 (App.Div.2006) (discussing and applying the act). The Legislature, however, also has identified exceptions to the "limitations on liability for operators" afforded by the participants' assumptions of the risk. N.J.S.A. 5:15-9; Stoffels, supra, 389 N.J.Super. at 216, 912 A.2d 184 (noting that the "broad protection afforded to operators of equine animal activities is *996 not absolute" and discussing the exceptions). Under specified circumstances a participant's assumption of inherent risks pursuant to N.J.S.A. 5:15-3 does not shield an operator from liability. N.J.S.A. 5:15-9. That statute provides:
Notwithstanding any provisions of [N.J.S.A. 5:15-3] to the contrary, the following actions or lack thereof on the part of operators shall be exceptions to the limitation on liability for operators:
a. Knowingly providing equipment or tack that is faulty to the extent that it causes or contributes to injury.
. . . .
c. A case in which the participant is injured or killed by a known dangerous latent condition on property owned or controlled by the ... operator and for which warning signs have not been posted.
d. An act or omission ... that constitutes negligent disregard for the participant's safety, which act or omission causes the injury, and
e. Intentional injuries to the participant caused by the operator.
[N.J.S.A. 5:15-9.]
In this case, the trial court concluded that plaintiffs' suit was barred because Gloria's injuries resulted from an assumed inherent risk and not from faulty equipment. Summary judgment was granted on the ground that there was no dispute of material fact and Spring Valley was entitled to judgment as a matter of law under the act. R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540, 666 A.2d 146 (1995).
Applying the same standard to assess the propriety of that grant of summary judgment, we conclude the evidence was adequate to present a jury question as to the existence of circumstances described in subsection a or d of N.J.S.A. 5:15-9. See Stoffels, supra, 389 N.J.Super. at 209, 216-18, 912 A.2d 184.
The "inherent risks" assumed by a participant are those "created by the equine animals, weather conditions, conditions of trails, riding rings, training tracks, equestrians, and all other inherent conditions." N.J.S.A. 5:15-3. But inherent risks do not include every danger on a training track or in a riding ring. Only "those dangers which are an integral part of equine animal activity" are included within the definition of inherent risks and the complete defense to suit afforded to operators. N.J.S.A. 5:15-2; N.J.S.A. 5:15-3; N.J.S.A. 5:15-5.
The definition of inherent risks provides no indication that the Legislature intended to include dangerous conduct and instrumentalities within the operator's capacity to control. In defining the "inherent risks," the Legislature provided additional guidance by way of a non-exhaustive list of illustrations. N.J.S.A. 5:15-2a-e. The illustration relevant to conditions of riding areas refers only to "natural hazards, such as surface or subsurface ground conditions." N.J.S.A. 5:15-2c; see also N.J.S.A. 5:15-2a-c, e (identifying propensities of equine animals, the "unpredictability" of the animals' behavior, the potential for collisions with animals or objects and negligence of other riders).
Moreover, despite the participant's assumption of inherent risks, N.J.S.A. 5:15-9 permits liability for operators who unreasonably enhance the risk of danger under designated circumstances. Thus, the act's protection is lost when an operator causes injury by knowingly using faulty equipment, by ignoring known and dangerous latent conditions under the operator's control, or through an action or omission that amounts to "negligent disregard for the participant's safety." N.J.S.A. 5:15-9a, c, d.
*997 We have no doubt that an owner who knows that training equipment is not properly installed or is inappropriate for the purpose it is used may be found to have knowingly provided equipment that is faulty within the meaning of N.J.S.A. 5:15-9a. Similarly, placement of equipment in a position that creates an unnecessary risk of personal injury may, under some circumstances, "constitute[ ] negligent disregard for the participant's safety" within the meaning of N.J.S.A. 5:15-9d, notwithstanding the assumption of risks for collisions and the conditions of tracks and rings. N.J.S.A. 5:15-2; N.J.S.A. 5:15-3; N.J.S.A. 5:15-9. Such dangers are additional risks created by the operator's selection and placement of instrumentalities within the operator's control. In those cases, the operator is liable to the extent the participant proves that his or her personal injury resulted from the acts or omissions that satisfy the elements of one of the exceptions stated in N.J.S.A. 5:15-9.
We reject Spring Valley's claim that the complete bar against suit for assumed risks and the irrelevance of comparative negligence when N.J.S.A. 5:15-3 is applicable, see N.J.S.A. 5:15-5, preclude liability for conduct of an operator that meets the requirements of a provision of N.J.S.A. 5:15-9. As noted above, an operator is liable for the injury caused by the acts or omissions specified in N.J.S.A. 5:15-9 notwithstanding any provisions of N.J.S.A. 5:15-3 to the contrary. Spring Valley's interpretation is inconsistent with that statutory language. Moreover, Spring Valley's interpretation would leave operators with little incentive to rectify or avoid creation of known dangerous risks that are unnecessary to the activity and easily eliminated. That is a result unquestionably in conflict with the Legislature's goal of shifting responsibility to participants for "inherent risks" of the activity that "are essentially impractical or impossible" for operators to correct. N.J.S.A. 5:15-1. We discern no intent to encourage conduct that makes these inherently dangerous activities more dangerous.
In this case the evidence relevant to the placement and use of the training poles and movable steps is not sufficiently one-sided to permit a grant of summary judgment in favor of Spring Valley. See Brill, supra, 142 N.J. at 540, 666 A.2d 146. Elder's expert opinion on the additional dangers posed by Spring Valley's use and positioning of that equipment would permit a jury to find that Gloria's injuries were caused by conduct within the scope of subsection a or d of N.J.S.A. 5:15-9. Accordingly, we reverse the grant of summary judgment based on the equine activities liability act. See Stoffels, supra, 389 N.J.Super. at 218, 912 A.2d 184 (holding that the evidence was adequate to withstand a grant of summary judgment on plaintiff's claim that defendant's "failure to take reasonable measures to match the rider to a suitable mount" constituted a negligent disregard for the rider's safety).
The question remaining is whether Spring Valley is entitled to summary judgment based on Gloria's agreement to release Spring Valley from liability based on its ordinary negligence. The release in this case was sufficiently broad to encompass any claim based on Spring Valley's ordinary negligence relating to its premises and operations. The release agreement provided:
In consideration of THIS STABLE allowing my participation in this activity,... I, the rider ... do agree to hold harmless, release, and discharge THIS STABLE, its owners, agents, employees... and others acting on its behalf ... of and from all claims, demands, causes of action and legal liability ... due to THIS STABLE'S ... ordinary negligence; and I do further agree that except *998 in the event of THIS STABLE'S gross negligence and willful and wanton misconduct, I shall not bring any claims, demands, legal actions and causes of action, against THIS STABLE ... for any economic and non-economic losses due to bodily injury, death, property damage, sustained by me ... in relation to the premises and operations of THIS STABLE....
The issue here is whether this exculpatory provision is enforceable against a claim that Gloria's physical injuries were caused by Spring Valley's use of faulty equipment or its acts or omissions "constitut[ing] negligent disregard for [Gloria's] safety." N.J.S.A. 5:15-9a, d.
The governing principles are clear. "Exculpatory agreements have long been disfavored in the law because they encourage a lack of care. For that reason, courts closely scrutinize liability releases and invalidate them if they violate public policy" or are unconscionable. Hojnowski v. Vans Skate Park, 187 N.J. 323, 333, 901 A.2d 381 (2006) (citations omitted); Lucier v. Williams, 366 N.J.Super. 485, 491, 841 A.2d 907 (App.Div.2004). Thus, waivers of the right to recover damages for negligence included in contracts of adhesion have been deemed unenforceable, Brough v. Hidden Valley, Inc., 312 N.J.Super. 139, 154, 711 A.2d 382 (App.Div.1998), but enforcement against a party who has "executed the agreement in order to engage in a recreational activity" is generally not denied on that ground, Marcinczyk v. State Police Training Comm'n, 406 N.J.Super. 608, 617, 968 A.2d 1205 (App. Div.2009); see, e.g., Stelluti v. Casapenn Enters., L.L.C., 408 N.J.Super. 435, 449-51, 975 A.2d 494, 2009 WL 2243696 at *7-*8 (App.Div.2009); McBride v. Minstar, Inc., 283 N.J.Super. 471, 490, 662 A.2d 592 (Law Div.1994), aff'd sub nom., McBride v. Raichle Molitor, USA, 283 N.J.Super. 422, 662 A.2d 567 (App.Div.), certif. denied, 143 N.J. 319, 670 A.2d 1061 (1995); see also Hojnowski, supra, 187 N.J. at 338, 347-48, 901 A.2d 381 (LaVecchia, J., dissenting).
The sources of public policy against which our courts have measured exculpatory clauses are varied. See Kuzmiak v. Brookchester, Inc., 33 N.J.Super. 575, 585, 111 A.2d 425 (App.Div.1955). Enforcement is denied when a contract "releases liability from a statutorily-imposed duty." Hojnowski, supra, 187 N.J. at 333, 901 A.2d 381; see, e.g., McCarthy v. NASCAR, Inc., 48 N.J. 539, 542, 226 A.2d 713 (1967) (duties imposed by law and regulations governing race tracks); Brough, supra, 312 N.J.Super. at 147, 711 A.2d 382 (statutory duties of ski area operators). But our courts have also refused to enforce exculpatory agreements when inconsistent with public policy inferable from statutory or established decisional law. See Hojnowski, supra, 187 N.J. at 334-37, 901 A.2d 381 (relying on the combination of public policies reflected in the parens patria doctrine and the common law duties of landowners to preclude enforcement of a parent's agreement to waive a child's right to damages for personal injuries arising from negligence related to premises); Gershon v. Regency Diving Ctr., Inc., 368 N.J.Super. 237, 248-51, 845 A.2d 720 (App. Div.2004) (barring enforcement of exculpatory release where it would undermine the beneficial purpose of the wrongful death act).
The Legislature's expression of policy inconsistent with enforcement of exculpatory agreements so as to defeat a claim of liability pursuant to N.J.S.A. 5:15-9 is sufficiently apparent to bar that use of a release. The Legislature has declared that its "allocation of the risks and costs of equine animal activities [under the equine activities liability act] is an important matter of public policy." N.J.S.A. 5:15-1. While the Legislature did not expressly impose affirmative duties on operators of equine animal activities, as it did in addressing operators of ski areas, see *999 N.J.S.A. 5:13-3, the Legislature identified conduct or circumstances that in its judgment warrant an operator's loss of the protection from liability afforded by the act. Liability for operators under the circumstances specified in N.J.S.A. 5:15-9 is a critical component of the Legislature's current balance of public and private interests in allocating the risks and costs of equine animal activity, N.J.S.A. 5:15-1. Use of an exculpatory agreement to permit escape from liability for personal injury authorized by N.J.S.A. 5:15-9 is so likely to upset the Legislature's balance of risks and costs that absent further direction from the Legislature, enforcement as a defense to liability in those circumstances must be denied as contrary to the policy expressed by the Legislature. For that reason, we reverse the grant of summary judgment based on the agreement to release Spring Valley from liability for ordinary negligence.
NOTES
[1] A participant is defined to include amateurs and professionals engaging in equine activity. N.J.S.A. 5:15-2.
[2] An operator is defined to include "a person or entity who owns, manages, controls or directs the operation of an area where individuals engage in equine animal activity." N.J.S.A. 5:15-2.
[3] The operator must post warnings of the limitation of liability for "inherent risks." N.J.S.A. 5:15-10.