1 A.3d 618

GLORIA HUBNER AND MICHAEL HUBNER, PLAINTIFFS–RESPONDENTS, v. SPRING VALLEY EQUESTRIAN CENTER, DEFENDANT–APPELLANT.

Argued March 22, 2010—Decided July 28, 2010.

*Mary O'Keefe Massey* argued the cause for appellant (*Goldberg Segalla,* attorneys).

*Andrew M. Wubbenhorst* argued the cause for respondents (*Johnson, Murphy, Hubner, McKeon, Wubbenhorst, Bucco & Appelt,* attorneys).

*Arthur A. McTighe* submitted a brief on behalf of amicus curiae New Jersey Farm Bureau (*McTighe & McTighe,* attorneys).

*Richard J. Mirra* submitted a brief on behalf of amicus curiae New Jersey Horse Council (*Hoagland, Longo, Moran, Dunst & Doukas,* attorneys).

Justice HOENS delivered the opinion of the Court.

Plaintiff Gloria Hubner was injured when she fell off a horse during a visit to defendant Spring Valley Equestrian Center in Newton. Defendant argues that even after giving plaintiff the benefit of all favorable factual inferences, her claim is barred by the Equine Activities Liability Act, *N.J.S.A.* 5:15-1 to -12 (Equine Act), or, alternatively, by the terms of a release she signed before mounting the horse. Defendant therefore asserts that in reversing the trial court's grant of summary judgment in its favor, the Appellate Division erred both in its analysis of the meaning of the Equine Act, *see Hubner v. Spring Valley Equestrian Ctr.,* 408 *N.J.Super.* 626, 634, 975 *A.*2d 992 (App.Div.2009), and in its conclusion that the release was unenforceable, *id.* at 637, 975 *A.*2d 992.

Because we agree with defendant that plaintiff's injuries were caused by one of the inherent risks of equine activities as defined in the Equine Act, *see N.J.S.A.* 5:15-2, -3, and that the Equine Act operates as a complete bar to plaintiff's claim, we reverse the judgment of the Appellate Division on that ground. We need not, and therefore we do not, express any opinion on the validity of the release.

## I.

The facts are not materially in dispute. On September 3, 2005, plaintiff Gloria Hubner,[1] along with her husband and a number of family members and friends, went to the Spring Valley Equestrian Center to go horseback riding. After signing a release form, plaintiff and the others were taken to the arena to mount the horses and participate in a training session prior to going out onto the trails.

As part of the planned training, plaintiff was instructed by Kate Martin, an employee of defendant Spring Valley, about how to manage the horse. Martin explained to plaintiff that she should pull the reins to the left to go left, that she should pull the reins to the right to go right, and that she should pull back on the reins if the horse began to rear its head. In addition to giving those instructions, defendant's practice was to prepare the riders for expected trail conditions by having the riders participate in an exercise in which each horse would walk over a series of wooden rails, called cavaletti. In anticipation of that exercise, the cavaletti had been placed on the ground near the center of the riding ring.

Plaintiff was the third member of her party to mount a horse. A portable mounting block had been placed near the center of the riding ring to assist the riders in getting on the horses, but plaintiff declined to use it. She was able to get onto the horse from the ground near the mounting block with Martin's assistance and when plaintiff mounted her horse, she and the horse were facing the cavaletti. After plaintiff was on the horse, Martin led plaintiff and the horse away from the mounting area to wait for the other riders to mount their horses. Martin left plaintiff positioned so that she and the horse continued to face the cavaletti and the portable mounting block.

---

[1] Plaintiff's husband Michael Hubner is also a named plaintiff, but because the factual assertions do not relate to him, we refer only to Gloria Hubner as the plaintiff.

As plaintiff waited for the others, the horse began to turn slowly to the right, and continued to turn, eventually completing a rotation of 180 degrees, so that plaintiff and her horse were no longer facing the center of the arena, the cavaletti, or the portable mounting block. The horse then threw its head up and down, whinnied, and began to move backwards. Plaintiff started screaming and pulling backward on the reins, which alerted Martin, who was then helping another rider to mount one of the other horses. Martin called out to plaintiff to stop pulling on the reins and, although plaintiff immediately complied, the horse continued to move backwards, increasing its speed until it tripped over one of the cavaletti. The horse then fell and plaintiff was thrown from it, landing on the portable mounting block, which caused her injuries.

During discovery, plaintiff produced the proposed expert report of Andrew Elder,[2] who concluded that defendant was negligent and that its negligence caused plaintiff's injuries. Elder opined that defendant was negligent because the cavaletti were unsecured and were set up near the mounting area and "behind the horses." He explained that "[h]orses cannot see behind them and the stepping on the unsecured pole would cause the horse to be further frightened and could cause it to fall as it did." He also commented that plaintiff's injuries were exacerbated because, when the horse fell, she was thrown against the portable mounting block, which, in his opinion, had also been negligently left behind the horse.

The trial court granted defendant's motion for summary judgment, concluding that whether plaintiff's injury was caused by the horse's unpredictable behavior or because the horse tripped over

---

[2] Although both the trial court and the Appellate Division discussed and considered Elder's opinions, he was never formally offered as an expert and the parties were never heard as to whether he has sufficient training, education or experience to be qualified to offer expert opinions. *N.J.R.E.* 702; *see Scully v. Fitzgerald*, 179 *N.J.* 114, 128–29, 843 *A.2d* 1110 (2004); *State v. Moore*, 122 *N.J.* 420, 458–59, 585 *A.2d* 864 (1991).

the cavaletti, the cause was one of the inherent risks of equine activity and plaintiff's claim was therefore barred by the Equine Act. As part of that analysis, the court concluded that the statutory exception to immunity if the facility knowingly provides equipment or tack that is faulty, *N.J.S.A.* 5:15–9(a), was not applicable, because the cavaletti were not faulty, but were simply part of the riding ring.[3]

The Appellate Division reversed the trial court's grant of summary judgment and remanded the matter for further proceedings. *Hubner, supra,* 408 *N.J.Super.* at 635, 637, 975 *A.*2d 992. The panel focused its analysis not on the statutory definition of inherent and assumed risks, *N.J.S.A.* 5:15–2, –3, but on the provisions of the Equine Act that create exceptions to the shield afforded to equine facility operators, *see N.J.S.A.* 5:15–9(a), (d). In considering whether one of the exceptions to the Equine Act's immunity provisions applied, the panel relied heavily on plaintiff's expert's opinion, which the panel concluded presented adequate evidence to withstand defendant's summary judgment motion.

In particular, the panel determined that "placement of equipment in a position that creates an unnecessary risk of personal injury may, under some circumstances, 'constitute[ ] negligent disregard for the participant's safety' ... notwithstanding the assumption of risks for collisions and the conditions of tracks and rings." *Hubner, supra,* 408 *N.J.Super.* at 634, 975 *A.*2d 992 (quoting *N.J.S.A.* 5:15–9(d)). Rejecting defendant's argument that the Equine Act serves as a complete bar against liability for any injury resulting from an inherent risk of equine activities, the panel concluded that "the evidence [including the expert report] relevant to the placement and use of the training poles and movable steps is not sufficiently one-sided to permit a grant of

---

[3] In the alternative, the court concluded that the exculpatory clause in the release that defendant required plaintiff to sign as part of the "Horse Rental Agreement" was enforceable, rejecting plaintiff's arguments that it was inconsistent with the Equine Act and that it was contrary to the public interest.

summary judgment in favor of Spring Valley."[4]  *Id.* at 635, 975 *A.*2d 992.

We granted defendant's petition for certification, 200 *N.J.* 505, 983 *A.*2d 1112 (2009), and we granted amicus curiae status to the New Jersey Farm Bureau and the New Jersey Horse Council.

## II.

Defendant advances a number of arguments on appeal.  First, defendant attacks the factual underpinnings of the Appellate Division's decision, arguing that the equipment was not faulty, because it was neither defective nor broken.  Rather, both the mounting block and the cavaletti were simply an ordinary part of the equipment in the riding ring.  Moreover, defendant asserts that it was the horse's unpredictable behavior of turning and moving backwards that set in motion the chain of events that led to plaintiff's injury.  Regardless of whether plaintiff was injured because the horse fell while moving backward or because it tripped over the cavaletti, the accident was the result of one of the inherent, and statutorily assumed, risks of equine activity.

Second, defendant asserts that the Appellate Division erred in its interpretation of the statute, because it failed to recognize that the overall purpose of the Equine Act is to create broad immunity for the operators of such facilities, with narrowly defined exceptions.  Defendant argues that instead of being faithful to that intent, the panel read the exceptions broadly, thwarting the essential purpose of the statute.

Plaintiff urges this Court to affirm the Appellate Division's judgment.  She argues that the panel's analysis of the Equine Act fully comports with the statute's meaning and purpose.  Moreover, she asserts that the panel correctly recognized that the

---

[4] Alternatively, the panel concluded that the exculpatory clause was not enforceable because of the likelihood that it would "upset the Legislature's balance of risks and costs ... [and would be] contrary to the policy expressed by the Legislature." *Hubner, supra,* 408 *N.J.Super.* at 637, 975 *A.*2d 992.

cavaletti were both faulty, *see N.J.S.A.* 5:15–9(a), and created an unnecessary risk that constituted negligent disregard for the participant's safety, *see N.J.S.A.* 5:15–9(d). She contends that either of those exceptions entitles her to recover for her injuries, notwithstanding her statutory assumption of inherent risks of the activity. *See N.J.S.A.* 5:15–3, –5.

Amicus New Jersey Farm Bureau argues that the Legislature enacted the statute for the purpose of preserving agriculture and agricultural lands through supporting and protecting the equine industry, and urges us to consider this important public policy when construing the Equine Act. Pointing to the statute's recognition of, and grant of immunity for, injuries caused by the unpredictable nature of horses, the Farm Bureau contends that the trial court, rather than the appellate panel, properly analyzed the statute, correctly concluding that plaintiff's claim was statutorily barred.

Amicus New Jersey Horse Council also urges this Court to broadly construe the Equine Act to achieve the Legislature's intent, and its declared purposes, of protecting equine facility operators from civil liability in tort and promoting equine activities and sports. More specifically, the Horse Council argues that the Legislature enacted the Equine Act as "remedial legislation" intended to reassert assumption of the risk as a complete defense and to remedy "a gap in the common law," in response to increased tort liability and increased insurance costs for equine operators. The Horse Council argues that the Appellate Division erred by substituting its view of public policy for the one expressed by the Legislature.

### III.

The Equine Act and its intended purposes are central to our consideration of this appeal. We need only recite briefly the familiar principles that guide us when we are called upon to engage in statutory interpretation. Our role "is to determine and effectuate the Legislature's intent." *Bosland v. Warnock Dodge,*

*Inc.,* 197 *N.J.* 543, 553, 964 *A.*2d 741 (2009). In making that determination, "we look first to the plain language of the statute, seeking further guidance only to the extent that the Legislature's intent cannot be derived from the words that it has chosen." *Pizzullo v. N.J. Mfrs. Ins. Co.,* 196 *N.J.* 251, 264, 952 *A.*2d 1077 (2008). Therefore, "we begin by reading the words chosen by the Legislature in accordance with their ordinary meaning, unless the Legislature has used technical terms, or terms of art, which are construed 'in accordance with those meanings.' " *Marino v. Marino,* 200 *N.J.* 315, 329, 981 *A.*2d 855 (2009) (internal citation omitted) (quoting *In re Lead Paint Litig.,* 191 *N.J.* 405, 430, 924 *A.*2d 484 (2007)). If the language is plain and if its meaning is clear, we do not rewrite it, nor do we "presume that the Legislature intended something other than that expressed by way of the plain language." *O'Connell v. State,* 171 *N.J.* 484, 488, 795 *A.*2d 857 (2002).

■ On the other hand, if the language is not plain, if the Legislature's intent is not clear, or if the words are "susceptible to more than one possible meaning or interpretation, courts may look to extrinsic secondary sources" to assist us. *Marino, supra,* 200 *N.J.* at 329, 981 *A.*2d 855; *see, e.g., Daidone v. Buterick Bulkheading,* 191 *N.J.* 557, 565–66, 924 *A.*2d 1193 (2007) (referring to legislative history); *Cox v. Sears Roebuck & Co.,* 138 *N.J.* 2, 15, 647 *A.*2d 454 (1994) (considering Governor's press release); *Panzino v. Cont'l Can Co.,* 71 *N.J.* 298, 301–02, 364 *A.*2d 1043 (1976) (relying on statements of sponsors of enacted bills).

■ In considering the Legislature's intent when the dispute between the parties rests on multiple parts of a single statute, we also strive to read and understand all of the provisions in harmony and as parts of a unitary enactment. *See Amerada Hess Corp. v. Dir., Div. of Taxation,* 107 *N.J.* 307, 321, 526 *A.*2d 1029 (1987) ("Statutes must be read as a whole, giving effect where possible to every word."); *Brown v. Brown,* 86 *N.J.* 565, 577, 432 *A.*2d 493 (1981) ("Each subsection should be read with respect to the

subject matter of the others and in harmony with each other and with the whole."). As this Court has explained:

> It is a cardinal rule of statutory construction that the intention of the Legislature is to be derived from a view of the entire statute and that all sections must be read together in the light of the general intent of the act so that the auxiliary effect of each individual part of a section is made consistent with the whole.
>
> [*Febbi v. Bd. of Review, Div. of Employment Sec.*, 35 *N.J.* 601, 606, 174 *A.*2d 481 (1961) (citations omitted).]

Finally, as we have previously noted, "exceptions in a legislative enactment are to be strictly but reasonably construed, consistent with the manifest reason and purpose of the law." *Serv. Armament Co. v. Hyland*, 70 *N.J.* 550, 558–59, 362 *A.*2d 13 (1976). Our understanding is further supplemented by the familiar canon of construction that "exceptions to remedial legislation are strictly construed." 3 Norman J. Singer, *Sutherland Statutory Construction*, § 60.1 (7th ed. 2007). With these familiar principles as our guide, we turn to our consideration of the Equine Act.

## A.

The Equine Act includes a section that expresses the Legislature's findings and its declaration of the purposes that it intended to achieve. Those expressions form an important part of the framework for our analysis of what the parties suggest are apparently contradictory provisions of the statute. The statute provides:

> The Legislature finds and declares that equine animal activities are practiced by a large number of citizens of this State; that equine animal activities attract large numbers of nonresidents to the State; that those activities significantly contribute to the economy of this State; and that horse farms are a major land use which preserves open space.
>
> The Legislature further finds and declares that equine animal activities involve risks that are essentially impractical or impossible for the operator to eliminate; and that those risks must be borne by those who engage in those activities.
>
> The Legislature therefore determines that the allocation of the risks and costs of equine animal activities is an important matter of public policy and it is appropriate to state in law those risks that the participant voluntarily assumes for which there can be no recovery.
>
> [*N.J.S.A.* 5:15–1.]

That declaration of the Legislature's findings expresses an overall intent to support and protect equine activities because of their importance to our economy and to open space preservation. Further, the findings demonstrate an intention to limit claims by participants, by defining those risks that the facility operator cannot effectively eliminate and that the participant assumes, and by precluding any recovery for an injury resulting from any of those assumed risks.

In furtherance of those overall goals, the Equine Act sets forth a non-exhaustive list of the "inherent risks," and defines them to be "dangers which are an integral part of equine animal activity." *N.J.S.A.* 5:15–2. Among those specifically-defined risks are several that are relevant to this appeal:

> a. The propensity of an equine animal to behave in ways that result in injury, harm, or death to nearby persons;
>
> b. The unpredictability of an equine animal's reaction to such phenomena as sounds, sudden movement and unfamiliar objects, persons or other animals;
> . . .
> d. Collisions with other equine animals or with objects; and
>
> e. The potential of a participant to act in a negligent manner that may contribute to injury to the participant or others, including but not limited to failing to maintain control over the equine animal or not acting within the participant's ability.
>
> [*Ibid.*]

Following the definitional section, with its non-exhaustive list of the inherent risks of equine activity, the statute provides that participants assume those risks along with "all other inherent conditions." *N.J.S.A.* 5:15–3. Moreover, that provision broadly describes the risks assumed by adding further language reflective of the expansive scope of the provision:

> A participant and spectator are deemed to assume the inherent risks of equine animal activities created by equine animals, . . . riding rings, . . . and all other inherent conditions. Each participant is assumed to know the range of his ability and it shall be the duty of each participant to conduct himself within the limits of such ability to maintain control of his equine animal and to refrain from acting in a manner which may cause or contribute to the injury of himself or others, loss or damage to person or property, or death which results from participation in an equine animal activity.
>
> [*Ibid.*]

In addition, the Equine Act specifies that *N.J.S.A.* 5:15-3, the section deeming inherent risks to be assumed, "shall be a complete bar of suit and shall serve as a complete defense to a suit against an operator by a participant for injuries resulting from the assumed risks, notwithstanding the ... comparative negligence [statute]." *N.J.S.A.* 5:15-5.

The apparent breadth of the protections afforded to operators of equine facilities through the definition of inherent risks and the assumption of risk provisions is tempered, however, by a separate provision that sets forth a series of exceptions. Those exceptions create circumstances in which a facility's operator may be liable for a participant's injury. *N.J.S.A.* 5:15-9. The appellate panel relied on two of these exceptions in its decision allowing plaintiff's suit to proceed. Those sections provide that it "shall be [an] exception[ ] to the limitation on liability for [an] operator [to]":

a. Knowingly provid[e] equipment or tack that is faulty to the extent that it causes or contributes to injury.

. . .

d. [Engage in a]n act or omission ... that constitutes negligent disregard for the participant's safety, which act or omission causes the injury[.]

[*N.J.S.A.* 5:15-9(a), (d).]

Although the words used by the Legislature in each part of the Equine Act appear plain, the manner in which they operate as a unified whole is not immediately apparent. That is because the words that define the risks assumed and the words that bar claims resulting from any of those risks are broadly preclusive, but the words chosen to delineate the exceptions to that bar also appear to be broad. As a result, were we to simply look to the words permitting a recovery notwithstanding the Equine Act's other provisions if the operator of the facility acted with "negligent disregard for a participant's safety," that exception might operate to effectively swallow the Act's protections entirely. On their surface, the risk assumption and the exception provisions are in conflict, which reveals a latent ambiguity in the overall meaning of the statute. In order to understand the Equine Act as a harmoni-

ous whole and to effectuate the Legislature's intent, therefore, we are required to delve behind the particular words chosen.

### B.

The bill that became the Equine Act, S. 282, was introduced in the Senate in January 1996. It was accompanied by a Sponsor's Statement explaining that its purpose was "to establish by statute the responsibilities and liabilities of those individuals who engage in equine activities." Sponsor's Statement, *Statement to Senate Bill No. 282* (Jan. 11, 1996). The bill was amended in committee, at which time certain language was broadened somewhat, expanding the statute's scope so that it applied not only to "equestrians" but to those who were "participants" in the activities. *Compare Senate Bill No. 282* (pre-filed Jan. 11, 1996) *with Senate Bill No. 282* (first reprint) (May 30, 1996).

After it was released from the committee, the bill was accompanied by a Committee Statement that expressed the Legislature's intent. *See* Senate Senior Citizens, Veterans' Affairs and Agriculture Committee, *Statement to Senate Bill No. 282* (May 30, 1996). According to the Committee Statement, the intention was to ensure that participants injured because of one of the defined assumed risks, and those injured in part by their failure to act within the limits of their abilities, would be barred from recovery. *Ibid.* At the same time, however, the Committee Statement recited the bill's proposed exceptions to the protections for the facility's operator. *Ibid.* The Committee Statement does not explain how the Legislature envisioned those potentially contrary provisions would work in harmony.

Although not recited as part of the legislative findings or the statements of the sponsor or the committee, the Equine Act is the third in a series of statutes that used assumption of risk principles to allocate responsibility for injuries sustained in inherently dangerous recreational activities. *See N.J.S.A.* 5:13-1 to -11 (Ski Act); *N.J.S.A.* 5:14-1 to -7 (Roller Skating Rink Safety and Fair Liability Act). The first of the three is the Ski Act, passed in

1979, *L.* 1979, *c.* 29, in direct response to the Vermont Supreme Court's decision in *Sunday v. Stratton Corp.*, 136 *Vt.* 293, 390 *A.*2d 398 (1978). *See* Assembly Judiciary, Law, Public Safety and Defense Committee, *Statement to Assembly Bill No. 1650*, at 1 (Nov. 20, 1978) (identifying Vermont Supreme Court's decision as impetus for bill); *Governor's Press Release for Assembly Bill No. 1650*, at 1 (Feb. 22, 1979) (same). In *Sunday*, the Vermont Supreme Court rejected [5] a ski area operator's assertion that the suit by a novice skier, who was injured by falling over brush growing on a beginner ski trail, was barred because it arose from an inherent risk of skiing that the participant had assumed. *Sunday, supra*, 390 *A.*2d at 403.

The essential premise supporting that holding is found in the court's explanation that it was trying to harmonize the doctrine of assumption of the risk with the principles expressed in Vermont's comparative negligence statute. *Ibid.* The court explained that, to the extent that there are inherent risks of the activity that the participant assumes, they are matters as to which defendant owes no duty, thus negating any conflict between assumption of risk and comparative negligence principles. *Ibid.* In applying that analysis to the facts in *Sunday*, the court reasoned that the ski area operator had a duty to maintain the slopes, and that the assumption of risk doctrine could not bar suit if the injury was caused by the condition of the "field" rather than by the "playing of the sport" itself. *Ibid.* (quoting *Garafano v. Neshobe Beach Club, Inc.*, 126 *Vt.* 566, 238 *A.*2d 70, 76 (1967)). As part of its analysis, the Vermont court relied on an explanation of the assumption of risk doctrine this Court had used in considering claims arising out

---

[5] The opinion in *Sunday* points out that when the matter was originally tried, the operator defended the claim by disputing plaintiff's account of how the accident happened, arguing that its trail-grooming techniques were so thorough that there could not have been brush growing on the novice slope. *Sunday, supra*, 390 *A.*2d at 402. The Court, recognizing that the assumption of risk argument was newly raised on appeal, opted to consider it, leading to the conclusions that became the motivating force behind our Legislature's response. *Id.* at 402–04.

of recreational sports injuries. *See id.* at 402–04 (citing *Meistrich v. Casino Arena Attractions, Inc.,* 31 *N.J.* 44, 155 *A.*2d 90 (1959)).

Our Legislature commented that the decision in *Sunday* had "caused considerable concern nationwide among ski area operators and their insurers over ... potential liability" to skiers. *Statement to Assembly Bill No. 1650, supra,* at 1. As a result, the Legislature concluded that it could best address the uncertainty that the *Sunday* decision created by defining the responsibilities of ski area operators, *N.J.S.A.* 5:13–3, by limiting their liability to a breach of one of those responsibilities, *N.J.S.A.* 5:13–3(d), and by identifying the duties of skiers and the risks that they assume, *N.J.S.A.* 5:13–4, –5, which would operate as a complete bar to any recovery, *N.J.S.A.* 5:13–6. In clear language, the Legislature provided that the participant's assumption of the identified risks would bar recovery and that our comparative negligence statute would only apply if the ski area operator breached one of its defined statutory duties. *N.J.S.A.* 5:13–6.

Because the Legislature responded to the *Sunday* decision, and because *Sunday,* in turn, rested in part on this Court's decision in *Meistrich,*[6] the explanation in *Meistrich* about how losses for inherently dangerous recreational injuries are allocated, bears consideration. Although referred to generally as an assumption of risk theory, this Court in *Meistrich* explained that there are two separate types of such claims, only one of which is barred. *See Meistrich, supra,* 31 *N.J.* at 48–51, 155 *A.*2d 90.

In its simplest explanation, the "primary" assumption of the risk refers to a known or obvious inherent risk, one as to which the operator of the recreational facility owes the participant no duty. A claim based on such a risk is barred because the operator has

---

[6] One commentator at the time pointed out that the new statute was consistent with longstanding common law precedents of this Court allocating responsibility for recreational activities that had been cited by the Vermont Supreme Court in *Sunday. See* Jeffrey W. Lorell, *The New Ski Law: Are Downhill Injury Claims Headed Downhill?,* 103 *N.J.L.J.* 197, at 14 (Mar. 8, 1979) (discussing Vermont Supreme Court's reliance on *Meistrich* ).

not breached a duty at all. *Id.* at 48–49, 155 *A.*2d 90. The "secondary" sense of assumption of risk arises where the operator has a duty, and has breached that duty, but asserts as an affirmative defense that plaintiff "voluntarily exposed himself to a risk negligently created by the master." *Id.* at 50, 155 *A.*2d 90. When the doctrine is used in its "secondary" sense, therefore, it operates as if it were in the nature of a contributory [7] negligence defense. *Id.* at 51, 155 *A.*2d 90; *see also* James Fleming, Jr., *Assumption of Risk: Unhappy Reincarnation,* 78 *Yale L.J.* 185, 187 n. 11 (1968) (highlighting *Meistrich* as leading case supporting proposition that plaintiff's unreasonable assumption of risk constitutes contributory negligence).

Much of this Court's focus in *Meistrich* was on the relationship between either type of assumption of risk and other principles of tort liability, including ordinary rules relating to contributory negligence and premises liability. The Court expressed, therefore, a concern that assumption of risk terminology, particularly when used in its "secondary" sense, might mislead a jury into thinking that an assumed risk overcame the defendant's obligation to behave in a reasonably prudent manner, even in regard to those risks within the facility operator's control. *Meistrich, supra,* 31 *N.J.* at 50–51, 155 *A.*2d 90. The Court thus focused on the problem of how to explain the complex concepts of assumption of the risk to juries. *Id.* at 54–55, 155 *A.*2d 90.

Applying the *Meistrich* framework in *Sunday,* the Vermont Supreme Court rejected a "primary" assumption of risk defense because the ski area operator had a duty to maintain the novice ski slope and the skier could not be said to have assumed the risk of an operator's lack of due care. *Sunday, supra,* 390 *A.*2d at 403.

---

[7] At the time *Meistrich* was decided, New Jersey was utilizing contributory negligence concepts. With the enactment of the Comparative Negligence Act in 1973, *see L.* 1973, *c.* 146 (codified at *N.J.S.A.* 2A:15–5.1 to –5.3), the harsh results of common law contributory negligence were equitably reformed. *See Suter v. San Angelo Foundry & Mach. Co.,* 81 *N.J.* 150, 161, 406 *A.*2d 140 (1979); *Schwarze v. Mulrooney,* 291 *N.J.Super.* 530, 539, 677 *A.*2d 1144 (App.Div.1996).

Even though that reasoning was consistent with *Meistrich*, the Vermont Supreme Court's apparent rejection of the assumption of risk defense caused concern about its implications for statutes that had abrogated contributory negligence and replaced it with a comparative negligence framework. When viewed in the appropriate historical context, the Ski Act itself is consistent with the characterization of assumption of the risk in *Meistrich* but clarified its implications by defining both the duties of the operator, the breach of which can give rise to liability, and the risks assumed, for which claims are barred. In doing so, the Ski Act made clear the intent of the Legislature that its intervening enactment of the Comparative Negligence Act would not alter that analysis. *See N.J.S.A.* 5:13–6; *Statement to Assembly Bill No. 1650, supra,* at 3.

The Roller Skating Rink Safety and Fair Liability Act (Roller Skating Rink Act), enacted in 1991, *L.* 1991, *c.* 28, is similar. It was explicitly intended to encourage that recreational activity, a "wholesome and healthy family" sport, and to recognize its contribution to the State's economy, while addressing the uncertainty of liability that had made insurance difficult and costly to obtain. *N.J.S.A.* 5:14–2 (expressing Legislature's declarations and findings). It was patterned after the Ski Act, in that it defined the duties of the operator of a roller skating rink, *N.J.S.A.* 5:14–4, the breach of which would be subject to a comparative negligence analysis, *see N.J.S.A.* 5:14–7, and it fixed the responsibilities of the skaters, *N.J.S.A.* 5:14–5, by defining those risks that the skater assumes and that operate as a complete bar to recovery, *N.J.S.A.* 5:14–7. *See* Assembly Judiciary, Law and Public Safety Committee, *Statement to Assembly Bill No. 3118,* at 1 (June 7, 1990) (explaining that bill was modeled on Ski Act); Senate Judiciary Committee, *Statement to Assembly Bill No. 3118,* at 1 (Oct. 15, 1990) (first reprint) (same).

Although the organizational pattern and structure of the Equine Act does not precisely mirror the Ski Act and the Roller Skating Rink Act, all three statutes reflect an effort to protect

operators of these recreational facilities from liability by maintaining an assumption of risk defense against injuries resulting from inherent conditions of the activity or the facility, while at the same time ensuring that operators manage the facility in a reasonable manner. All three, therefore, remain faithful to the "primary" and "secondary" analytical framework of this Court's *Meistrich* decision.

## C.

The Equine Act, like the Ski Act and the Roller Skating Rink Act, is designed to establish a dividing line between the known and inherent risks of the endeavor that are assumed by the participant, and those events or conditions that are within the control of, and thus are part of the ordinary obligations of, the facility's operator. *See, e.g., Hojnowski v. Vans Skate Park*, 187 *N.J.* 323, 340, 901 *A.*2d 381 (2006); *Brett v. Great Am. Recreation, Inc.*, 144 *N.J.* 479, 499, 677 *A.*2d 705 (1996). In the Ski Act and the Roller Skating Rink Act, the Legislature specifically commented that it was listing the responsibilities of participants and operators in order to create certainty for purposes of insurance. *Statement to Assembly Bill No. 1650, supra*, at 1; *N.J.S.A.* 5:14–2(b). In the Equine Act, the policy expressed is different, focusing only on support for equine activities and preservation of open space. *N.J.S.A.* 5:15–1. The omission of a reference to insurance availability [8] suggests that the Legislature had an enhanced concern for preserving and protecting these particular operations or facilities. Moreover, that expression of a protective policy goal demonstrates that the Legislature intended that the provisions

---

[8] Although amicus New Jersey Horse Council suggested that insurance availability and cost was one of the concerns that motivated the Legislature when it adopted the Equine Act, the only authorities it cited in support of that proposition are from jurisdictions other than New Jersey. *See, e.g., Amburgey v. Sauder*, 238 *Mich.App.* 228, 605 *N.W.*2d 84, 93 (1999); Krystyna M. Carmel, *The Equine Activity Liability Acts: A Discussion of Those in Existence and Suggestions for a Model Act*, 83 *Ky. L.J.* 157, 168 (1994). Our Legislature did not include that concern explicitly in its expressions of intent.

expressing the scope of the risks assumed would be read broadly in favor of the operators, while the obligations of the operators would be narrowly construed if the two sections of the statute appear to conflict.

Understanding and harmonizing the statute's provisions requires us to see them in the context of an activity that has inherent risks and dangers that are beyond the ability of the operator to control. In trying to identify those inherent risks, the Legislature principally considered the nature of horses, their size, strength, unpredictable nature and propensities, all compounded by the presence of other participants and their horses. Similarly, the Legislature recognized that there are many dangers posed by the terrain over which the horses are ridden and the surface conditions of riding rings. The statute expresses the Legislature's decision that risks that are inherent and essentially uncontrollable, which it has attempted to define, are risks that the participant assumes. But in mandating that there can be no claims for an injury ascribed to any of those risks, the Legislature also sought to draw a line between the assumed risks and those matters that remain within the realm of duties of care owed to the participant by the operator of the facility.

The statute reflects that notwithstanding the many and varied inherent risks of equine activities, the operator of the facility owes the participants certain ordinary duties of care, defined through the statute's expression of exceptions to the bar on claims for injuries resulting from any of the assumed risks. *N.J.S.A.* 5:15–9. Some of the exceptions are clear and need little explanation. For example, if the operator assigns a first-time rider to a horse that the operator knows is particularly high-strung, fractious, or difficult to manage, a claim for a resulting injury would fall within the statute's exceptions. *N.J.S.A.* 5:15–9(b); *see Stoffels v. Harmony Hill Farm*, 389 *N.J.Super.* 207, 217–18, 912 *A.*2d 184 (App.Div.2006) (considering "failure to take reasonable measures to match the rider to a suitable mount" in context of subsection (d)). So, too, would the operator be required

to answer for its intentional act that injured a participant. *N.J.S.A.* 5:15–9(e).

Other exceptions, including the two on which the Appellate Division relied, are somewhat less clear, as this appeal illustrates. For example, the statute provides that if the facility knowingly provides the rider with faulty equipment that causes the injury, it will not escape liability. *N.J.S.A.* 5:15–9(a). Some fact patterns would plainly fall within that exception. Thus, if the operator knows that a saddle has a badly worn girth strap that breaks and causes the rider to fall off the horse, or that a bridle has a faulty bit attachment that breaks so that the rider loses the means to control the horse, the exception will support a finding of liability. Other factual circumstances, however, are not so clearly within this exception.

The Appellate Division, in part, concluded that the "faulty equipment" exception might apply to plaintiff's claims in this matter. *Hubner, supra,* 408 *N.J.Super.* at 635, 975 *A.*2d 992. Relying on plaintiff's proposed expert report, which suggested that the cavaletti were "faulty" because they were not secured, the panel reasoned that the exception could apply. *Ibid.* We, however, do not agree with that conclusion. As the examples we have provided demonstrate, the statutory exception must refer to equipment that is itself faulty, a conclusion for which there is no support in the record. Rather, according to the proposed expert, the cavaletti were faulty because they were not secured. We decline to read the "faulty equipment" exception so that it encompasses equipment in good working order, as were the cavaletti. To the extent that the operator of the facility might be liable based on the manner of their placement, it would not be because they were faulty, *see N.J.S.A.* 5:15–9(a), but because the operator acted with "negligent disregard for the participant's safety," within the meaning of *N.J.S.A.* 5:15–9(d), a question to which we now turn.

The Legislature's expressed intent to protect and promote equine activities by defining the line between the inherent risks

assumed by the participant and the ordinary duties of care owed to the participant by the facility's operator must inform our consideration of the exception principally relied on by the appellate panel, that is, "[a]n act or omission on the part of the operator that constitutes negligent disregard for the participant's safety." *N.J.S.A.* 5:15-9(d). Although that subsection of the statute includes language that could be read expansively, the historical background in which the Equine Act was adopted and the overall intention expressed by the Legislature demand that it be given a narrow reading. That is, we understand it to require that the plaintiff demonstrate that the injury was caused by the facility operator's breach of a recognized duty of care owed to the participant. Reading the exceptions in the Equine Act in this manner allows the statute to function as do the provisions in the Ski Act and the Roller Skating Rink Act, by separating those risks that are assumed from the statutorily-defined duties of care that the facility's operator owes to the participants.

It is not enough, therefore, for plaintiff to point to a claimed act or omission, because it is only an act or omission that rests on one of the duties that the operator owes to the participant that will support relief. Nor will it be sufficient for a participant to characterize an injury caused by one of the expressly defined assumed risks in language designed to make it appear that in some fashion the injury arose through an act or omission of the operator. Instead, the participant must demonstrate that the injury arose not because of one of the inherent dangers of the sport, but because the facility's operator breached one of the duties it owes to the participant, as defined in the statute's exceptions. A contrary approach, in which the exceptions are read expansively, would threaten to upset the choice that the Legislature has made, because it would potentially permit the exceptions to extinguish the statute's broad protective scope.

Thus, for example, if the operator permits the facility to fall into disrepair and a participant is injured because the door of a stall falls off of its rusted hinges onto him or her, the exception would

apply because the operator has acted with negligent disregard by breaching its ordinary duty to make the premises reasonably safe. On the other hand, if the horse is frightened by a loud noise and runs head-long into the stall door, injuring the participant, the claim will be barred because the behavior of the horse, an assumed risk, was the cause.

Applying these principles to the facts before us, the outcome is clear. In large part, our analysis rests on the undisputed facts about how the incident happened and, to a lesser extent, upon what those facts do and do not support as they were interpreted by the proposed expert's opinion. The conclusion in that opinion that the facility's operator was negligent was based on two essential facts. That is, although the report pointed to the fact that the cavaletti were unsecured, the author based his conclusion about the cause of the injury on the assumption that the facility's operator had placed the cavaletti behind the horse where they could not be seen. There is simply no basis in the factual record for that assumption, as plaintiff concedes that it was only after the horse turned around that it was faced away from the cavaletti and the mounting block.

There is no dispute that the cavaletti themselves were in good condition and were on the ground in the middle of the riding ring, where they were part of the equipment to be used for training the riders. There is equally no dispute that plaintiff, both before and after she mounted the horse, was facing the cavaletti and that she was seated on the horse facing them while awaiting the other riders. There is no dispute that the horse began to turn until the cavaletti were behind it, after which it moved its head up and down and began moving backwards, eventually tripping over the cavaletti. All of those undisputed facts fall within the defined inherent dangers of an equine activity and therefore within the risks that plaintiff assumed.

To the extent that plaintiff's proposed expert report opined that the operator was negligent for leaving the cavaletti behind the horse, or on the ground and unsecured behind the horse, or for

leaving the portable mounting block behind the horse, that opinion is based on a factual assumption found nowhere in the record. Nothing in the record suggests that the operator had a duty of care embraced within the statute's exceptions that it breached, or that such a breach led to the injury about which plaintiff complains. To the extent that the appellate panel concluded to the contrary, it erred.

## IV.

The judgment of the Appellate Division is reversed and the judgment of the Law Division is reinstated.

*For reversal and reinstatement*—Justices LONG, LaVECCHIA, ALBIN, WALLACE, RIVERA–SOTO, and HOENS—6.

*Opposed*—None.

*Not Participating*—Chief Justice RABNER.

