NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO.  A-1585-15T3

SAMUEL KIRKPATRICK, JR.,
a minor by his g/a/l KAREN
KIRKPATRICK and KAREN
KIRKPATRICK, individually,

    Plaintiffs-Appellants,

v.

HIDDEN VIEW FARM and
DOROTHY NESTI,

    Defendants-Respondents,

and

MARY OROS,

    Defendant.

---

> **APPROVED FOR PUBLICATION**
>
> **January 9, 2017**
>
> **APPELLATE DIVISION**

Argued December 19, 2016 — Decided January 9, 2017

Before Judges Sabatino, Haas and Currier.

On appeal from Superior Court of New Jersey,
Law Division, Middlesex County, Docket No.
L-2317-14.

Ashley A. Smith argued the cause for
appellants (Eichen Crutchlow Zaslow &
McElroy, LLP attorneys; Christian R.
Mastondrea, on the brief).

Stephen J. Spudic argued the cause for
respondents (Britt, Riehl & Spudic, PC,
attorneys; Mr. Spudic, on the brief).

The opinion of the court was delivered by

SABATINO, P.J.A.D.

This appeal concerns whether the personal injury liability immunity the Legislature created under the Equestrian Activities Liability Act (the "Equine Act"), N.J.S.A. 5:15-1 to 12, applies to a minor who accompanied family members to a horse farm but who did not personally take part in any horse-related activity there. The minor was bitten by another boarder's horse as he walked by its stall. His mother was nearby in the stable at the time, cleaning out the adjacent stall of her own horse.

The trial court held that the Equine Act's statutory immunity applied to this situation, and granted summary judgment to the defendant horse farm and its owner. We agree with the court that although the minor did not ride or take care of any horses the day he was bitten, his role in accompanying his mother and sister, who were engaged themselves in such equine activities, placed him within the immunity statute's broad definition of a covered "participant," N.J.S.A. 5:15-2. Consequently, we affirm.

I.

We derive from the summary judgment record these salient facts that bear upon the immunity issues. In doing so, we consider the record in a light most favorable to the movants.

R. 4:46-2(c); Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995); see also W.J.A. v. D.A., 210 N.J. 229, 237-38 (2012) (applying the same summary judgment standards on appeal).

Defendant Dorothy Nesti is the owner of co-defendant Hidden View Farms, a horse farm in Monroe Township. For many years, Nesti has operated the farm and provided riding lessons there. The farm has quarters for twenty-five to thirty horses in several stables. The stalls within those stables are approximately twelve by fifteen foot enclosures.

The barn where the biting incident occurred has three stalls. "Fanny" (apparently shortened from "Fantasma"), the horse that bit the minor plaintiff, Samuel Kirkpatrick, Jr. ("Samuel"), occupied the middle stall. "Eclipse," the horse owned by the plaintiff mother Karen Kirkpatrick[1], used the stall farthest from the barn entrance. All of the stalls had half-door openings, through which a horse could stick its head out. The openings were about twelve feet apart so that horses in adjacent stalls could not reach each other. The stalls were separated by plywood walls that extended to the ceiling.

Outside the stable, the farm had posted liability warning signs referring to the Equine Act. Karen acknowledged at her

---

[1] To avoid confusion among the family members, we at times refer to the mother by her first name, intending no disrespect.

deposition that she had read the signs before the biting incident.

Karen is the mother of three children: a daughter who was age sixteen at the time of the incident; an older son who was then age twelve; and Samuel, who was then age nine. Karen has a bachelor's degree in animal science. She has owned horses intermittently since she was fifteen. She has competed in 4H fairs, and has taught riding to others.

Karen met Nesti when she was in high school. Due to their mutual interest in horses, they often interacted over the course of twenty-five years. Nesti gave the horse Eclipse to Karen for free in the spring of 2012, after the Kirkpatricks had donated money to Nesti's horse rescue operation. Karen paid monthly fees to board Eclipse at Hidden View Farm.

Karen testified that, although her daughter took formal riding lessons on Eclipse, her sons were never formally trained as riders. Before the biting incident, Samuel would occasionally mount Eclipse while being led around by an adult, in the style of a "pony ride."

Fanny is a gelding of the Paso Fino breed. He was approximately sixteen to eighteen years old at the time of the incident. Fanny had boarded at Hidden View Farm for eight

years.  Nesti owned Fanny for two years before selling him to co-defendant Mary Oros in 2007.

Oros has owned seven horses in her life.  She did not ask Nesti about Fanny's temperament before purchasing him, but did ride him beforehand.  After becoming Fanny's owner, Oros paid a monthly fee to board Fanny at Hidden View Farm.

According to Oros, prior to the incident with Samuel, she had not witnessed Fanny acting aggressively towards people or animals.  However, she did testify that Nesti told her Fanny had bitten a dog after the dog first bit Fanny.

Although horses were frequently moved around different stalls at Hidden View Farm, Karen testified that she had cleaned Eclipse's stall, when it was located next to Fanny's stall, about five to seven times before the biting incident.  Sometimes Karen gave Fanny hay, but she would not directly feed him.  Karen stated that Fanny would "pin his ears back when you walked by, but you just stayed away."  She also noticed he would be "s[w]ishing tails.  Just signs of aggravation."

During her own deposition, Nesti acknowledged that she had seen Fanny act aggressively toward other horses and dogs but not people.  In particular, she recalled seeing Fanny pick up an eighty-pound dog with its mouth and hurl the dog about two feet.

She denied telling anyone that Fanny was aggressive toward humans.

In the summer of 2013, Nesti underwent foot surgery. Consequently, she used crutches or an ATV to move around the farm. Karen helped Nesti on the farm while she recovered. Karen did so by teaching lessons and cleaning stalls, in exchange for discounts on board and horse transportation. Occasionally, Nesti would pay Karen for her services in cash.

Karen testified that she spent three to four days a week at Hidden View Farm that summer, for "anywhere from two to eight" hours each day. She would bring her daughter along to ride horses. Sometimes, she also would bring her two sons.

Samuel estimated at his deposition that he visited the farm "a couple of times a week" throughout the summer of 2013. Karen testified that, while she was on the property, Samuel and his brother would typically spend their time in the common area, run in the yard where there was a swing set, or play "by the pond and look for toads and look for snakes and turtles."

Nesti testified that she sometimes complained to Karen about the boys "climbing on hay feeders" in the horse fields, or climbing too high in trees where Nesti "was afraid they were going to fall." Even so, Nesti described the boys generally as "good kids."

A-1585-15T3

During her deposition, Karen testified that she told Samuel and his brother not to "approach any horse unless an adult is with you and you have their permission." Karen also recalled that she told Samuel not to "pet or feed any horse without permission."

Samuel accompanied his mother and siblings to Hidden View Farm on the morning of the incident, September 2, 2013. According to his mother, Samuel was then about four foot, three or four inches in height, and he weighed sixty to sixty-five pounds.

Samuel testified that he knew his mother was helping Nesti while she recovered from her foot injury by "clean[ing] the stalls and teach[ing] lessons[.]" During his time at the farm, Samuel would "help my mom and play with my brother." Although he recalled that Nesti warned him not to "run around the horses," he does not remember if Nesti told him not to go to the horse stalls if his mother was not around. He testified that his mother did tell him "to stay away from any horse I didn't know."

Samuel testified that he had previously ridden Eclipse and learned how to groom horses. However, on the day of the incident, he did not interact with Eclipse or any horse other than his unplanned encounter with Fanny.

As recounted by Karen, on the morning of the incident, she took her children to Hidden View Farm for about three hours. She testified that Samuel and his brother played at the pond, while she was in the nearby riding ring.

According to the daughter's deposition testimony, she was at the farm "almost every day" that summer. She not only would ride Eclipse and some of the other horses, but also would assist her mother with chores on the farm, such as "getting water" and "cleaning stalls." When she arrived with her mother and brothers on the morning of the incident, the daughter helped feed the horses by filling the buckets in their stalls, although she was not sure if she fed Fanny. She recalled that she also "pulled down hay" with her mother for the horses. Her mother then began teaching. While her mother was teaching, the daughter would "clean everything up and put it back in the tack room," and "go and make sure everyone had water."

Karen testified that she gave a lesson on the morning of the incident for about forty-five minutes. She testified that she could see the boys from the riding ring. Around noon, she returned to the stables, where she began to clean Eclipse's stall. Karen testified that she could still see the boys at the pond from the stalls, which was about thirty yards away. During

8                                                              A-1585-15T3

this time, her daughter was walking from the other horse field toward Eclipse's and Fanny's stable.

Karen testified that she had been cleaning Eclipse's stall for about ten minutes before Samuel's accident. Using a pitchfork, she was shoveling debris into a "muck tub" when Samuel began to walk toward Eclipse's stall.

Karen did not see Fanny bite Samuel. She turned back into the stall, and then the next thing she heard was Samuel screaming that the horse had bit him. As Samuel described it, he

> [w]ent to ask my mom when we were leaving . . . and she was in the stall of our horse, Eclipse's stall, cleaning it and I was walking over to ask her when we were leaving. And there — when I was walking into our horse's stall, another horse, he peeked his head out of his stall and I stopped and looked at it. And then he pinned his ears back and I remember my mom told me that means he's mad. And so — so before I could react, he leaned forward really fast and bit — well, he tried to bite my head, but I put my arm up to stop him and he bit my arm. And I pulled back so he wouldn't like grab my arm and pull it to him. So I pulled back and I yelled and my mom came out and carried me to the barn and she put a gauze on my arm and the ambulance came and that's all I remember.

Karen then saw Samuel holding his right arm. She "picked him up and . . . put the piece of skin that was hanging off,

A-1585-15T3

[and] just flipped it forward so that he couldn't see it." She yelled for Nesti to call an ambulance.

When Samuel was bitten, Nesti was outside the stable about 100 feet away on an ATV. At her deposition, she testified that she saw Samuel come out of Fanny's stall after he screamed. She could not say precisely where Samuel was when he was bitten, but believed he had been in Fanny's stall at the time. She referred to the incident as "an unfortunate accident that the poor little kid got hurt."

Samuel testified that this was the first time he saw Fanny. He had never ridden, pet, or fed the horse before. When Fanny bit him, Samuel testified that he was not trying to pet or feed the horse.

Samuel was taken by an ambulance to a local hospital, where a doctor sewed his wound shut. He spent the night at the hospital before being released home the next day. He had several plastic surgeries thereafter. He claims to have sustained residual scarring and other alleged injuries that do not bear upon the immunity analysis involved in this appeal.

As guardian ad litem for Samuel, Karen filed a personal injury negligence action in the Law Division on his behalf and individually against Nesti, Hidden View Farm, and Oros. In essence, plaintiffs contended that defendants should have been

aware of Fanny's proclivity for aggressive behavior and taken precautions that would have prevented the horse from biting Samuel. Plaintiffs retained an equine expert to support those claims. In the expert's written report and deposition testimony, she opined that Fanny had exhibited sufficient indicia of aggressiveness to require measures to keep him a safe distance from others in the barn. Specifically, the expert testified that defendants should have posted a specific warning sign by Fanny's stall, stating, "Be careful. This horse bites."

Defendants denied liability. They each filed counterclaims against Karen, alleging that she failed to supervise Samuel sufficiently while he was on the property, a contention that Karen denied. See Foldi v. Jeffries, 93 N.J. 533 (1983) (recognizing a limited exception to parental tort immunity in circumstances of willful or wanton neglect).

All defendants moved for summary judgment. After hearing oral argument, Judge Joseph L. Rea granted the motions. With respect to Oros, Fanny's owner, the judge concluded that plaintiffs had not shown that Oros had breached any alleged duty to Samuel.[2] As to Nesti and the farm, the judge ruled that plaintiffs' claims against them were barred as a matter of law

---

[2] Plaintiffs have not appealed the summary judgment granted to Oros.

by the immunity afforded in the Equine Act.  Given those rulings, the judge dismissed the counterclaim as moot.

Plaintiffs now appeal, essentially contending that the trial court erred as a matter of law in finding that Nesti and the farm are immunized under the Equine Act from liability in this setting.  Nesti and the farm have provisionally cross-appealed, seeking to revive the counterclaim for parental neglect if and only if the complaint is reinstated.

II.

In 1997, the Legislature enacted the Equine Act, which limits how and when a person injured by equine animals may sue in tort.  N.J.S.A. 5:15-1 to -12.  The Legislature found that large numbers of citizens practiced activities with equine animals and those activities contributed to the State's economy.  N.J.S.A. 5:15-1.  Lawmakers also found that "horse farms are a major land use which preserves open space."  N.J.S.A. 5:15-1.  See also Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 195-207 (2010) (detailing in depth the legislative history, objectives, and terms of the statute).

Because it deemed these equine activities to "involve risks that are essentially impractical or impossible for the operator to eliminate," the Legislature declared that the risks of injury arising from equine activities "must be borne by those who

engage in those activities." N.J.S.A. 5:15-1. Accordingly, as a matter of risk allocation, the Legislature crafted the immunities from liability codified in the Equine Act. The statute mandates, subject to certain narrow exceptions, that "the participant voluntarily assumes [the risk] for which there can be no recovery." N.J.S.A. 5:15-1.

The Equine Act specifically defines the "operators" who it generally shields from tort liability and the "participants" and "spectators" who instead bear the risk. An "operator" means "a person or entity who owns, manages, controls or directs the operation of an area where individuals engage in equine animal activities whether or not compensation is paid." N.J.S.A. 5:15-2. Plaintiffs do not dispute that defendants Nesti and Hidden View Farm are "operators" of an equine facility within the meaning of the statute.

Most importantly for purposes of this case, the Equine Act very broadly defines the term "participant" to encompass:

> any person, whether an amateur or professional, engaging in an equine animal activity, whether or not a fee is paid to engage in the equine animal activity or, if a minor, the natural guardian, or trainer of that person standing in loco parentis, and shall include anyone accompanying the participant, or any person coming onto the property of the provider of equine animal activities or equestrian area whether or not an invitee or person pays consideration.

[<u>N.J.S.A.</u> 5:15-2 (emphasis added)].

Further, the statute defines a "spectator" as "a person who is present in an equestrian area for the purpose of observing equine animal activities whether or not an invitee." <u>N.J.S.A.</u> 5:15-2.

An "equine animal activity" is defined within the statute as:

> any activity that <u>involves the use</u> of an equine animal and shall include selling equipment and tack; transportation, including the loading and off-loading for travel to or from a horse show or trail system; inspecting, or evaluating an equine animal belonging to another person whether or not the person has received compensation; placing or replacing shoes on an equine animal; and veterinary treatment on an equine animal.
>
> [<u>N.J.S.A.</u> 5:15-2].

The Legislature placed the burden on "participants" and "spectators" of "equine animal activities" to assume the risks:

> <u>created by equine animals</u>, weather conditions, conditions of trails, riding rings, training tracks, equestrians, <u>and all other inherent conditions</u>. Each participant is assumed to know the range of his ability and it shall be the duty of each participant to conduct himself within the limits of such ability to maintain control of his equine animal and to refrain from acting in a manner which may cause or contribute to the injury of himself or others, loss or damage to person or property, or death which results from participation in an equine animal activity.

[<u>N.J.S.A.</u> 5:15-3 (emphasis added)].

The statute's non-exhaustive list of such inherent risks includes "the propensity of an equine animal to behave in ways that may contribute to injury, harm or death <u>to nearby persons</u>." <u>N.J.S.A.</u> 5:15-2(a) (emphasis added). In addition, the risks include "the unpredictability of an equine animal's reaction to such phenomena as sounds, sudden movement and unfamiliar objects, <u>persons</u> or other animals." <u>N.J.S.A.</u> 5:15-2(b) (emphasis added). <u>See also</u> <u>Hubner</u>, <u>supra</u>, 203 <u>N.J.</u> at 196.

To implement the assumption of risk denoted in <u>N.J.S.A.</u> 5:15-3, the Legislature imposed in <u>N.J.S.A.</u> 5:15-5 a "complete bar of suit" against an operator by a "participant for injuries resulting from the assumed risks[.]" <u>N.J.S.A.</u> 5:15-5. As the Supreme Court noted in <u>Hubner</u>, <u>supra</u>, 203 <u>N.J.</u> at 197, the "apparent breadth" of these liability protections for equine operators is "tempered" by certain limited exceptions set forth in <u>N.J.S.A.</u> 5:15-9.

Among other things, the codified exceptions include "knowingly providing equipment or tack that is faulty to the extent that it causes or contributes to injury," <u>N.J.S.A.</u> 5:15-9(a); "failure to make reasonable and prudent efforts to determine the participant's ability to safely manage the particular equine animal," <u>N.J.S.A.</u> 5:15-9(b); a participant's

injury or death caused by "a known dangerous latent condition or property" without posted warning signs, N.J.S.A. 5:15-9(c); acts or omissions that "constitute[] negligent disregard for the participant's safety," N.J.S.A. 5:15-9(d); and "intentional injuries to the participant" caused by an operator, N.J.S.A. 5:15-9(e).

As the Court determined in Hubner, the statute's listed exceptions to an operator's immunity from liability are limited in scope. "[T]he Legislature intended that the provisions expressing the scope of the risks assumed would be read broadly in favor of the operators, while the obligations of the operators would be narrowly construed if the two sections of the statute appear to conflict." Hubner, supra, 203 N.J. at 203-04. To obtain recovery, "the participant must demonstrate that the injury arose not because of one of the inherent dangers of the sport, but because the facility's operator breached one of the duties it owes to the participant, as defined in the statute's exceptions." Id. at 206. The Court reasoned that, "[a] contrary approach, in which the exceptions are read expansively, would threaten to upset the choice that the Legislature has made, because it would potentially permit the exceptions to extinguish the statute's broad protective scope." Ibid.

To illustrate this point, the Court in Hubner noted that an operator would not be shielded by the statute if it allowed its premises to fall into such disrepair that a stall door with rusted hinges fell upon a participant. Id. at 206-07. By contrast, if a horse were frightened by a loud noise and ran head-long into a stall door causing a similar injury, the claim would be barred by the statute "because the behavior of the horse, and assumed risk, was the cause." Id. at 207.

In keeping with these principles, the Court in Hubner enforced the statute's immunity in a situation in which a plaintiff sued a horse farm for injuries sustained while a horse she was riding tripped over equipment (a "cavaletti") left on the floor of the riding ring, reared, and threw her. Id. at 190. The Court's analysis largely centered on whether the equipment the horse tripped over was "faulty" so as to trigger the "faulty equipment" exception to immunity delineated in N.J.S.A. 5:15-9(a). Id. at 190-92. The Court concluded that the equipment was not faulty, and the possibility of a horse tripping over riding equipment and throwing a rider were inherent dangers of equine activity for which the plaintiff bore the risk. Id. at 207. Hence, the statute's immunity for such inherent dangers applied to insulate the defendant operator,

resulting in the Court reinstating summary judgment for the operator.

The critical legal issue presented here is whether Samuel should be classified as a "participant" for purposes of the Equine Act. Neither Hubner nor the only other reported New Jersey case applying the statute have addressed such a classification issue with respect to a plaintiff, such as this minor, who accompanied another person who was using an equine facility. See Stoffels v. Harmony Hill Farm, 289 N.J. Super. 207, 217-19 (App. Div. 2006) (analyzing whether a defendant horse farm was negligent for having an inexperienced rider on an aggressive horse).

For the reasons that follow, we conclude that the trial court correctly resolved this question of first impression and deemed this minor plaintiff to be a "participant" covered by the broad definition in N.J.S.A. 5:15-2.

As we have already pointed out, the statute's broad definition of a "participant" sweeps in not only persons who are "engaging in" equine animal activities, but also "anyone accompanying" such individuals. N.J.S.A. 5:15-2. In addition, although we need not reach this additional facet, the definition extends even further to "any person coming onto the property of

the provider of equine animal activities or equestrian area whether or not an invitee or person pays consideration." Ibid.[3]

We concur with Judge Rea that Samuel falls within the statute's expansive definition of a "participant." First, we agree with the judge's finding that both Karen and Samuel's sister were on the premises that day to engage in "equine animal activities" within the meaning of the statute. Karen was on the premises to give a riding lesson to another equestrian, and thereafter to clean out her horse's stall. She and Samuel's sister also performed various horse-related chores for the owner that day, including apparently feeding the horses and providing them with hay. Although their efforts seem to have been motivated, at least in part, by commendable altruism in helping out a friend after her surgery, the substantive nature of their activities was clearly within the zone of equine activities covered by the statute. Both Karen and Samuel's sister were thus themselves "participants" within the meaning of N.J.S.A. 5:15-2.

As the next step of the analysis, we consider Samuel's status with reference to that of his other family members. We

---

[3] We do not need to consider here, for example, whether the definition and statutory immunity logically should extend to a mail carrier or delivery person who is simply on the premises and not accompanying an equine activity participant, when such a person is injured by a horse.

agree with the motion judge that he was not a "spectator" within the terms of N.J.S.A. 5:15-2 because he was clearly not on the premises "for the purpose of observing equine activities" by his mother or sister. Instead, Samuel was at the farm, as he had been many times during that summer, to play with his brother on the property by the pond and in the common area. He essentially was there for recreation while school was not in session and where his mother could attempt to watch over him while she went about her teaching, chores, and other horse-related endeavors.

Plaintiffs argue that because Samuel was not at the farm to use the facility himself for equine-related purposes, he cannot be considered a "participant" under the statute. But that argument overlooks the statutory definition's expansive inclusion of not only persons who engage in equine-related activities, but also those who "accompany" such persons. See also N.J.S.A. 5:15-2(a) (noting the risks of injury that horses can pose to "nearby" persons). The plain meaning of the words of the statute controls. Bd. of Educ. of Neptune v. Neptune Twp. Educ. Ass'n, 144 N.J. 16, 25 (1996) (instructing that a statute's plain meaning controls if it is "clear and unambiguous on its face and admits of only one interpretation").

Samuel was clearly accompanying his mother and sister on the premises. He did not come to the premises on his own. In

fact, perhaps ironically, he was injured while walking into the stable to speak to his mother about when they would be leaving the premises together.

It is irrelevant that, when briefly questioned about Samuel's status by plaintiffs' counsel at her deposition, Nesti stated that she did not consider him a "participant" in equine activities. Her understanding of the term as a layperson does not bear upon the legal question. See N.J.R.E. 701 (reciting the limited grounds for the admission of lay opinions). It is the "court's function," not a witness's, to answer questions of law. Bedford v. Riello, 392 N.J. Super. 270, 278 (App. Div. 2007), rev'd on other grounds in part, aff'd in part, 195 N.J. 210 (2008). Any opinions given by witnesses, experts or otherwise, on questions of law need not be accepted by reviewing courts and may be disregarded. Perez v. Rent-A-Center, Inc., 375 N.J. Super. 63, 73 (App. Div. 2005), rev'd on other grounds, 186 N.J. 188 (2006).

As we have already pointed out, the Equine Act adopts a stylized definition of "participant" much broader than the term's conventional meaning, undoubtedly in an effort that is to advance the strong immunity policies underlying the legislation. Moreover, we note that counsel did not furnish the broader statutory definition to Nesti when he posed the question to her.

Hence, her unschooled lay response on this nuanced definitional question is inconsequential.

Having resolved that Samuel was indeed a participant within the scope of the law, we further agree with the trial court that there are no genuine issues of material fact that could defeat defendants' immunity from suit. None of the limited exceptions set forth in N.J.S.A. 5:15-9 pertain here. This unfortunate event was instead the result of the inherent proclivities of horses at times to bite or nip at humans who are within or near their physical space. Even if we accept at face value the opinions of plaintiffs' expert that this particular horse was known to be aggressive and prone to biting and that stronger warnings may have reduced the risks of harm, her views do not take this event out of the zone of the legislatively-crafted immunity.

Summary judgment as to defendants Nesti and Hidden View Farm is affirmed. We have no need to address the dismissal of defendants' provisional counterclaim.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1585-15T3