**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-3270-22

CHARLES A. WILLIAMS and
DEANNA WILLIAMS, husband
and wife,

      Plaintiffs-Appellants,

v.

MICHAEL J. GULOTTA, THE
WISHING STONE SYNDICATE,
DEO VOLENTE FARMS, LLC,
and DEO VOLENTE
INTERNATIONAL, LLC,

      Defendants-Respondents,

and

SUGAR VALLEY FARMS,

      Defendant.

_____

Argued September 12, 2024 – Decided September 30, 2024

Before Judges Sabatino, Gummer, and Berdote Byrne.

On appeal from the Superior Court of New Jersey, Law Division, Mercer County, Docket No. L-1750-20.

Michael R. Paglione argued the cause for appellants (Szaferman, Lakind, Blumstein & Blader, PC, attorneys; Marc A. Brotman, on the briefs).

David S. Osterman argued the cause for respondent (Goldberg Segalla, LLP, attorneys; David S. Osterman and Leo Capoferri, on the brief).

PER CURIAM

In this personal-injury action, where plaintiff Charles Williams was injured by a stallion ("Wishing Stone"), plaintiffs[1] appeal from a May 31, 2023 order awarding defendants Deo Volente Farms ("Deo Volente") and Michael J. Gulotta summary judgment and dismissing plaintiffs' complaint. Appealing only the dismissal of the claim for strict liability, plaintiffs ask us to consider whether the trial court erred in finding they had failed to present evidence of a genuine dispute of material fact as to Wishing Stone's natural inclination or habitual tendency towards aggressive behavior, relying upon Model Civil Jury Charge 5.60B. They also assert the trial court erred in analogizing the Equine Activities Liability Act ("EALA" or "the Act"), N.J.S.A. 5:15-1 to -12, to the facts of this case to find further support in immunizing defendants from liability.

---

[1] Plaintiffs are Williams and his wife.

Although we agree the trial court improperly analogized this case to the EALA, plaintiffs fail to demonstrate any genuine issue of fact showing Wishing Stone had any natural inclination or habitual tendency towards aggression that would expose defendant-owners to common-law strict liability. Their reliance on an expert opinion as to the aggression of stallions in general contravenes our requirements for applying strict liability to domesticated animals, and the evidence otherwise fails to surmount the summary-judgment standard. As such, we disagree with plaintiffs and affirm the trial court's dismissal of their complaint.

I.

Wishing Stone is a retired, standardbred racehorse, owned in part by defendant Deo Volente, where defendant Gulotta is the chief executive officer. Deo Volente breeds standardbred racehorses and purchased a fractional interest in Wishing Stone to sell his semen to other horse owners. Wishing Stone is the subject of a syndication agreement that grants Deo Volente full custody, control, and management over the stallion.

As part of the syndication agreement, Wishing Stone's semen was collected at several different farms from 2014 to 2017, including Deo Volente's

farm in 2014, Sugar Valley Farms[2] in 2015 and 2016, and Southwind Farms ("Southwind") in 2017 and 2018. During this time, Williams was employed as a stallion manager at Southwind and was responsible for taking care of the stallions boarded at Southwind, including feeding them, cleaning them, and taking them to their paddocks and stables. He was also responsible for taking the stallions to and from Southwind's breeding shed.

Williams first interacted with Wishing Stone in 2017 during the stallion's first stay at Southwind, which passed without incident. According to Williams, when Wishing Stone returned to Southwind in 2018 the stallion was "different" and unlike any other horse Williams had encountered over the years. Williams had watched Wishing Stone while the stallion was in his paddock and observed "how he charged the fences when people drove the golf cart around his paddock" and "showed anger and everything like that there." Based on his observations, Williams told Laura Young, Southwind's manager, that Wishing Stone "wasn't right in the head" and warned other Southwind employees to be cautious around the horse.

---

[2] Sugar Valley was dismissed from the complaint on January 25, 2021, for lack of personal jurisdiction.

The parties agree defendants never witnessed or were made aware of this alleged behavior. Discovery also revealed none of the other farms where Wishing Stone had previously boarded for semen extraction ever communicated any concerns to defendants regarding Wishing Stone's alleged aggression.

Wishing Stone did have a specific proclivity -- he was difficult to catch in his paddock. Plaintiff testified at deposition he had to entice Wishing Stone with a bucket of grain or get assistance from another Southwind employee to help catch the stallion.

Wishing Stone also had a history of difficulty in performing the requirements of semen collection. In the standardbred-breeding industry, stallions are taken to the breeding shed usually three to four days a week, where they mount a "phantom" mare, and the semen is collected in an artificial vagina. Deviations from this schedule are made when stallions are unable to ejaculate or are fatigued or when staff is unable to get the stallion to mount the phantom mare.

At Southwind, Wishing Stone was given four breaks from the semen-collection schedule: from August 21, 2017 through September 1, 2017; August 10, 2018 through August 24, 2018; August 24, 2018 through August 31, 2018;

5

and September 26, 2018 through October 3, 2018. The last time Wishing Stone's semen was successfully collected before the accident was September 26, 2018.

On the morning of October 3, 2018, plaintiff fed, groomed, and led Wishing Stone to his paddock without incident. Some time later, plaintiff caught Wishing Stone in the paddock and began taking the stallion, unaccompanied, to the breeding shed. Just before plaintiff reached the shed, Wishing Stone suddenly attacked him, knocked him down, and struck Williams with his hooves. A farmhand at Southwind overheard the incident and intervened by tossing a bucket of water at Wishing Stone, causing the stallion to back away. Williams was sent to the hospital and discharged the same day. He has not worked since the attack.

Plaintiffs filed a complaint against Gulotta, Deo Volente, and Sugar Valley Farms claiming negligence. Defendants timely answered plaintiffs' complaint and raised the EALA as an affirmative defense. In response, plaintiffs moved to dismiss the EALA defense, which the court dismissed with prejudice on September 10, 2021. Plaintiffs were then granted leave to file an amended complaint to add a cause of action for common-law strict liability against defendants.

A-3270-22

After the close of discovery, defendants moved for summary judgment, which the trial court granted on May 31, 2023, and dismissed plaintiffs' amended complaint in full. In opposition to defendants' summary-judgment motion, plaintiffs had argued common-law strict liability required a jury be allowed to ascertain whether defendants had knowledge of Wishing Stone's natural inclination towards dangerous behavior or the stallion's individual proclivity towards aggression. The trial court disagreed with plaintiffs' natural-inclination hypothesis, finding it was "not prepared to issue a blanket statement on the inherently vicious nature of stallions in general." The court also found no evidence defendants had actual or constructive knowledge of a dangerous trait or propensity possessed by Wishing Stone that would subject defendants to strict liability and dismissed plaintiffs' amended complaint.

The court additionally found imposing strict liability "would be against the [EALA's] legislative intent." Although it noted its prior order ruled the EALA did not apply "because the incident did not occur on [d]efendants' farm . . . and, therefore, [defendants] were not 'operators' as defined" by the EALA, the court nevertheless analyzed the meaning of the terms "participant" and "equine animal activities" as defined in the EALA to determine if the Act would otherwise have been applicable. After reviewing similar statutes from other

A-3270-22

jurisdictions and our case law regarding the EALA, the court found plaintiff, as an employee, was a "participant" and breeding was an "equine animal activity" as defined by the Act. As such, the court concluded it "would seem incongruent" to hold defendants strictly liable "when an absolute immunity would have been available under the [EALA] had . . . [d]efendants been deemed operators."

## II.

We review the trial court's grant of summary judgment as the trial court does, viewing the motion record in a light most favorable to the non-moving party, here plaintiffs. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 528-29 (1995); see also R. 4:46-1 to -6; Statewide Ins. Fund v. Star Ins. Co., 253 N.J. 119, 124-25 (2023). We review a grant of summary judgment de novo. Statewide Ins. Fund, 253 N.J. at 124-25.

## A.

As an initial matter, we note the trial court erred in concluding that a finding of common-law strict liability against defendants "would be incongruent" with the EALA. Not only do the parties agree the EALA does not apply to the circumstances of this case, nothing in the Act's language suggests it applies to an employee of a for-profit semen-collection farm, for injuries imparted by a stallion against the owner of that horse.

8

The Legislature passed the Act in 1979 with the express purpose of limiting liability for personal injury arising from a recreational participant's assumption of the risk inherent in some horse-related activities. N.J.S.A. 5:15-1. The Legislature declared "equine animal activities involve risks that are essentially impractical or impossible for the operator to eliminate" and "those risks must be borne by those who engage in those activities." Ibid. The Act expresses "an overall intent to support and protect equine activities because of their importance to our economy and to open space preservation." Hubner v. Spring Valley Equestrian Ctr., 203 N.J. 184, 196 (2010).

The Act provides "participant[s]" and "spectator[s]" assume the inherent risks of "equine animal activities" and provides a complete defense from a lawsuit brought by a participant against an equine activity "operator." N.J.S.A. 5:15-3, -5. The trial court found plaintiff would be a "participant" and horse breeding an "equine animal activity" within the EALA's meaning and would otherwise entitle defendants to EALA immunity. It then concluded it "would seem incongruent to this [c]ourt for [d]efendants to be held strictly liable for [p]laintiff's horse [attack] when an absolute immunity would have been available under the [EALA] had . . . [d]efendants been deemed the operators of the farm."

9

As noted by the trial court, the EALA provides immunity only to "operators" of farms, not owners of horses such as defendants. Because defendants are not "operators" within the EALA's ambit, it is inconsequential whether plaintiff would otherwise be a "participant" and breeding an "equine animal activity." We are limited to the EALA's plain meaning and cannot expand immunity beyond what the Act explicitly permits. See W.S. v. Hildreth, 252 N.J. 506, 518-19 (2023).

Moreover, the legislative protection is constrained to recreational activities involving horses where third parties may be injured and does not apply to other for-profit activities involving horses. For example, the horse-racing industry in New Jersey is specifically excluded. See N.J.S.A. 5:15-12. Defendants' public-policy argument, raised for the first time on appeal and focusing on the economic impact of potential liability in urging us to expand the Act's protection, lacks merit. The EALA is designed "to allocate responsibility for injuries sustained in inherently dangerous recreational activities." Hubner, 203 N.J. at 198. Liability for injuries associated with the boarding of horses between the horse's owner and a farm may easily be negotiated by contract. In fact, in this case, defendants signed a waiver addressing the parties' respective responsibilities for any injury to Wishing Stone during the semen-collection

process. There is no similar agreement in the record regarding liability for injuries sustained by the breeding farm's employees caused by the horse, although the parties could have negotiated an appropriate contractual provision. If, as defendants posit, the Legislature intended the EALA to insulate horse owners for purely economic purposes, it would have made little sense to exempt the entire horse-racing industry from the Act's protection.

## B.

Although we conclude the trial court erred in finding support in the EALA, we affirm the trial court's grant of summary judgment to defendants because plaintiffs fail to demonstrate a genuine issue of material fact showing defendants knew or should have known Wishing Stone had either an inherent natural tendency towards dangerous behavior or a specific proclivity towards aggression that would allow the imposition of strict liability upon Wishing Stone's owners.

Plaintiffs' appeal is limited solely to their claim for strict liability against defendants. They contend our common law and Model Jury Charges (Civil), 5.60B, "Animal with Vicious or Dangerous Trait or Propensity (Other than an Owner Dog Bite Case)" (approved Sept. 1980), "provide[] a strict liability cause of action, other than 'negligence,' stemming from injuries caused by an animal

11

alleged to have vicious propensities." Plaintiffs contend the charge "defines 'vicious or dangerous trait or propensity' in the disjunctive," permitting them to establish defendants' liability with evidence of either a natural inclination in the breed or a habitual tendency in the specific animal, and assert they proffered sufficient evidence of both.

Plaintiffs posit the question before the trial court was "whether a reasonable jury could conclude that [d]efendants, as professional stallion breeders, knew or should have known that Wishing Stone had a natural inclination for dangerous and aggressive behavior toward people around him . . . ." In support, they direct us to Hyun Na Seo v. Yozgadlian, 320 N.J. Super. 68, 72 (App. Div. 1999), where we commented that a landlord's responsibility for injuries resulting from a dog's attack "should be determined by ordinary principles of negligence," rather than strict liability, "in the absence of proof that the landlord was aware of the [animal's] vicious propensities, or perhaps that the dog was inherently vicious."

1. Common-law strict liability based upon an animal's natural inclination.

Plaintiffs rely upon the expert testimony of Susan McDonnell, Ph.D., who opined stallions, as a class of horse, "are inherently dangerous and have a natural propensity to express violent behavior." These characteristics, according to

McDonnell, render stallions distinct from other classes of horses. According to McDonnell, every stallion is capable of this kind of attack. At her deposition, McDonnell stated she had never met or examined Wishing Stone and confirmed her report "addresses the . . . nature of stallions and the inherent risks associated with breeding stallions in general."

This reliance on the general nature of stallions would obviate the common-law scienter requirement for injuries caused by domestic animals. Plaintiffs ask us to treat all stallions as wild animals, where a dangerous propensity is presumed "and liability does not rest upon any experience with the particular animal." Eyrich v. Earl, 203 N.J. Super. 144, 147 (App. Div. 1985) (quoting Prosser & Keeton, Torts, § 76, at 542 (5th ed. 1984)). There is no legal basis to support such a departure from our caselaw. Pursuant to common-law strict liability, plaintiffs must demonstrate scienter on the part of the animal's owners, requiring them to show defendants knew or should have known Wishing Stone specifically had a dangerous trait or propensity, not all stallions in general. See, e.g., Yozgadlian, 320 N.J. Super. at 73 (affirming award of summary judgment when plaintiff failed to offer proof "Yoon's dog" was known to have vicious propensities); Jannuzzelli v. Wilkens, 158 N.J. Super. 36, 39 (App. Div.

1978) (describing one of the issues on appeal as whether the defendants knew of their dog's vicious propensities).

Plaintiffs' additional claim, that the Restatement (Second) of Torts (Am. L. Inst. 1965) has been "superseded" by the Restatement (Third) of Torts (Am. L. Inst. 2010), is both factually incorrect and unavailing. Comment (e) of Restatement (Third) of Torts § 23 explicitly states: "In the future, courts might wish to give consideration to particular genders or breeds of a species that involve danger levels uncommon for the species itself. If so, it might be appropriate to impose strict liability, without individualized scienter, on the owner of such an animal." Ibid. (emphasis added). The section still requires the animal's owner to know or have reason to know the animal "has dangerous tendencies abnormal for [its] category" for strict liability to apply. Id. § 23. The comment is also expressed in tentative terms and does not purport to be authoritative.[3] McDonnell's expert report fails to raise a material issue that would defeat summary judgment.

_____

[3] We note although our Supreme Court has adopted some of the provisions within the Third Restatement, see, e.g., Ross v. Lowitz, 222 N.J. 494, 505-06 & n.7 (2015) (applying the Restatement (Second) of Torts to assess liability for private nuisance, which remains unchanged by the Third Restatement); Jerista v. Murray, 185 N.J. 175, 198 n.3 (2005) (adopting the Third Restatement approach for strict products liability cases), the Court has not endorsed the Third

14

2. Common-law strict liability based upon an animal's habitual tendency.

Plaintiffs alternately posit a genuine issue of material fact exists as to whether defendants had actual knowledge of Wishing Stone's specific dangerous characteristics, relying upon emails from Southwind's staff to Deo Volente personnel. That argument is belied by the record.

First, plaintiffs rely upon an October 9, 2017 email from Young to Deo Volente personnel stating Wishing Stone "was fine this morning" and "he was a lot calmer" as evidence of defendants' knowledge of the horse's alleged aggression. Linda Petrenko, the stallion and breeding administrator for Deo Volente, testified she had received the email but did not inquire further. She testified she had told Gulotta Wishing Stone had been "a lot calmer," but he did not direct her to make further inquiries. Importantly, the email was sent in 2017; plaintiff testified Wishing Stone was an "easy" horse in 2017, but behaved in a markedly different manner when he returned in 2018. Young stated in a September 18, 2017 email that Wishing Stone was "one of the easiest horses" from which she had ever collected semen.

_____

Restatement in its entirety. See, e.g., Fowler v. Akzo Nobel Chems., Inc., 215 N.J. 300, 331 (2022) (declining to apply the Third Restatement: Products Liability to cases involving asbestos).

A-3270-22

Secondly, plaintiffs rely on emails from 2018 regarding the semen-collection breaks. However, when read in context, the emails refer to the stallion's low libido as the reason for the scheduled breaks in the collection schedule. In fact, plaintiffs admitted defendants had no prior knowledge of Wishing Stone's alleged dangerous behavior in their responses to defendants' material statement of facts relative to the summary-judgment motion.

Lastly, even assuming defendants had some basic knowledge of the "absence of calm" in Wishing Stone at times, all of the information plaintiffs rely upon was imparted to defendants by plaintiffs' own employer. Plaintiffs cannot show defendants had any information regarding an alleged dangerous propensity in Wishing Stone unknown to Southwind. As such, Williams' employer was in the superior position of putting in place any precautions that may have prevented the accident.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-3270-22